# IN THE SUPREME COURT OF IOWA

No. 16–1031

Filed August 31, 2018

**MYRON DENNIS BEHM, BURTON J. BROOKS, ROBBY LEE LANGSTON, DAVID LEON BRODSKY, JEFFREY R. OLSON,** and **GEOFF TATE SMITH,**

Appellants,

vs.

**CITY OF CEDAR RAPIDS** and **GATSO USA, INC.,**

Appellees.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Linn County, Christopher L. Bruns, Judge.

Plaintiffs request further review of court of appeals decision affirming summary judgment in favor of the defendants on plaintiffs' putative class action challenging city's automated traffic enforcement ordinance. **DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

James C. Larew of Larew Law Office, Iowa City, for appellants.

Elizabeth D. Jacobi, Assistant City Attorney, for appellee City of Cedar Rapids.

Paul D. Burns and Laura M. Hyer of Bradley & Riley PC, Iowa City, for appellee Gatso USA, Inc.

**APPEL, Justice.**

In this case, we once again consider a range of issues related to an automated traffic enforcement (ATE) system. The City of Cedar Rapids (Cedar Rapids or City) enacted an ordinance designed to authorize and implement the establishment of an ATE system intended to detect drivers traveling in excess of speed limits within Cedar Rapids. Pursuant to the ordinance, Cedar Rapids contracted with Gatso USA, Inc. (Gatso) to install the ATE system, which included mounted cameras and radar equipment, and to provide the City with evidence of vehicles violating the speed limit at the ATE locations. The ATE ordinance imposed a civil penalty for a violation.

The plaintiffs filed a class-action petition against Cedar Rapids and Gatso. The plaintiffs sought damages and declaratory and injunctive relief, claiming the ATE system as implemented by the defendants violated the equal protection, due process, and privileges and immunities clauses of the Iowa Constitution. The plaintiffs also raised a number of other challenges, asserting that the administrative remedies under the ATE ordinance were in conflict with Iowa law, that the ATE ordinance as implemented by the City's contract with Gatso unconstitutionally delegated governmental power to a private entity, and that the defendants were unjustly enriched by the revenues generated by the ATE system.

The district court granted the defendants summary judgment, and the plaintiffs appealed.

We transferred the case to the court of appeals. The court of appeals affirmed the district court. For the reasons expressed below, we vacate the decision of the court of appeals and affirm in part and reverse in part the judgment of the district court.

**I. Factual and Procedural Background.**

**A. Structure of Cedar Rapids' ATE System.**

1. *The ordinance.* In 2009, Cedar Rapids enacted an ordinance establishing an ATE system. Cedar Rapids, Iowa, Mun. Code § 61.138 (2016).[1] The ordinance authorizes Cedar Rapids to "deploy, erect or cause to have erected an automated traffic enforcement system for making video images of vehicles that . . . fail to obey speed regulations . . . in the city." *Id.* § 61.138(a). The ordinance authorizes the hiring of a contractor "with which the City of Cedar Rapids contracts to provide equipment and/or services in connection with the Automated Traffic Enforcement System." *Id.* § 61.138(b)(2).

The ordinance provides that when the ATE system generates an image of a speeding vehicle, a notice of violation is mailed to the vehicle owner within thirty days after obtaining the owner's identifying information. *Id.* § 61.138(d)(1). The ordinance further provides that a vehicle owner may contest the citation by requesting an administrative hearing "held at the Cedar Rapids Police Department before an administrative appeals board . . . consisting of one or more impartial fact finders." *Id.* § 61.138(e)(1). Upon receiving the board's decision, the ordinance provides a vehicle owner with the option of either paying the fine or submitting a request that the City file a municipal infraction in the small claims division of district court. *Id.* § 61.138(e)(2).

In any small claims court proceeding, Cedar Rapids is required to show "by clear, satisfactory, and convincing evidence" that the vehicle was travelling in excess of the posted speed limit. Iowa Code § 364.22(6)(*b*) (2015). The ordinance authorizes a fine of between $25

---

[1]The ordinance is available online at https://www.municode.com/library/ia/cedar-rapids/codes/code_of_ordinances?nodeId=CH6ATRRE_61.138AUTREN.

and $750. Cedar Rapids, Iowa, Mun. Code § 61.138(c)–(d). The ordinance also notes that state-mandated court costs are added to the amount of the fine if the vehicle owner is found guilty after a small claims court proceeding. *Id.* § 61.138(e); *see also* Iowa Code § 364.22(8).

2. *Gatso's contract with Cedar Rapids.* Pursuant to the ordinance, Cedar Rapids entered into a contract with Gatso in 2009. The contract provided that Cedar Rapids and Gatso had previously identified locations where ATE equipment would be installed. Gatso was responsible for all costs and expenses associated with the installation, operation, and maintenance of the ATE equipment. Gatso agreed to keep the ATE system in compliance with all Cedar Rapids and Iowa Department of Transportation (IDOT) standards.

The contract provided that once the ATE system was operational, Gatso was responsible for developing images and obtaining data from the ATE equipment and presenting the information to the City as "an electronic violation package." The contract further provided that such violation packages would be processed through a web-based application that would allow the City's police department to review, approve, or reject each violation before a citation was issued.

The contract provided that if Cedar Rapids rejected a violation, Cedar Rapids would report to Gatso the basis for the rejection. If Cedar Rapids approved a violation package, the contract called upon Gatso to send a citation to the registered owner of the vehicle by mail using its web-based program. If the registered owner chose to pay the citation, Gatso would accept violation payments on behalf of the City by check, credit card, or money order.

Under the contract, Gatso's fee for services was $30 per paid violation, later reduced to $25 per paid violation. For its ATE services,

Gatso received payments of $817,960, $2,537,280, $2,152,650, $2,137,140, and $1,163,400 from Cedar Rapids for calendar years 2010 through 2014. For the period between March 17, 2015, and January 25, 2016, Gatso received $1,749,143.

**B. Gatso's Notices to Alleged Violators.**

1. *Content of notice of violation.* Each of the plaintiffs in this case received a "Notice of Violation" of the ATE ordinance. The notice of violation displayed the City of Cedar Rapids logo and had the signature of the Cedar Rapids law enforcement officer who approved issuing the citation.

The front page of the notice of violation provided information about the time and place of the alleged violation along with two photos of the vehicle recorded by the ATE system. The front page of the notice of violation provided the following admonition:

> Failure to pay the civil fine or to contest liability within (30) calendar days is an admission of liability in the full amount of the civil fine assessed and will result in the loss of your right to a hearing. In addition, you may be subject to formal collection procedures including, but not limited to, being reported to a credit reporting agency, and a civil lawsuit.

The backside of the notice of violation provided information about how to pay the civil penalty. It also stated that a person receiving the notice of violation had a right to contest the violation in person at an administrative hearing. The notice of violation suggested that recipients wishing to contest the violation "review the city ordinance, the images, and the actual recorded video (if applicable) of the infraction" and provided a limited list of "valid defenses." The list of valid defenses does not include a defense that the driver was a person other than the vehicle's registered owner. The backside of the notice of violation cautioned that the failure to appear at an administrative hearing "will

result in a final determination of liability." The notice of violation made no mention of the recipient's option of requesting Cedar Rapids initiate a small claims action in district court where Cedar Rapids would bear the burden of proof of showing a violation "by clear, satisfactory, and convincing evidence." Iowa Code § 364.22(6)(*b*).

2. *Content of "notice of determination of liability."* If the first notice of violation did not result in payment or the scheduling of an administrative hearing, Gatso sent out another document to the vehicle owner entitled "Notice of Determination 2nd Notice." As with the notice of violation, the notice of determination carried the City of Cedar Rapids logo and had the signature of a law enforcement officer.

The notice of determination provided the same information about the time and place of the alleged offense as the notice of violation. It contained, however, a slightly different admonition than the original notice of violation:

> Failure to pay the civil fine or to appeal this determination within (30) calendar days may result in the possible imposition of a late fee. In addition, you may be subject to formal collection procedures including, but not limited to, being reported to a credit reporting agency, and a civil lawsuit.

The backside of the notice of determination also differed from the notice of violation. Unlike the notice of violation, the notice of determination declared that citizens could resolve the notice of determination by paying the fine or "request[ing] a trial before a judge or magistrate" within thirty days of the date listed on the front of the notice.

3. *Content of nonresident request for hearing, non-appearance form.* A third form generated with the Cedar Rapids logo was entitled "Request for Hearing, Non-Appearance Form." This form was available to vehicle owners who did not reside in Iowa. The request for hearing, non-

appearance form declared that the form "must be completed in full including a statement of facts specifying grounds for challenging the violation notice." The request for a hearing, non-appearance form listed certain defenses, but it did not mention the option of requesting that Cedar Rapids institute a municipal infraction action in district court.

**C. Appeal Before Administrative Appeals Board.** Although the ATE ordinance refers to an administrative appeals board, the ordinance states that the board consisted of "one or more impartial fact finders." Cedar Rapids, Iowa, Mun. Code § 61.138(e)(1). In all the administrative hearings involved in this case, the administrative appeals board consisted of a single person. While the ordinance calls for an impartial administrative appeals board, the ordinance does not establish procedures or criteria for appointment. The ordinance does not describe the burden of proof or the procedures to be applied in the administrative proceedings.

The plaintiffs in this case received a "Findings, Decision and Order" in connection with their administrative appeals. A person identified as an "Administrative Hearing Officer" signed the documents. The documents declared "IT IS ORDERED" that liability has been determined and presented a dollar amount representing a "JUDGMENT TOTAL." The findings, decision, and order expressly advised recipients of the option of requesting that a municipal infraction be issued and filed in district court.

**D. IDOT Rulemaking and Enforcement Actions.**

1. *IDOT rules related to ATE systems.* Several years after the Cedar Rapids ATE system commenced operation, in February of 2014, the IDOT promulgated administrative rules relating to ATE systems. Iowa Admin. Code ch. 761—144. The rules declared that their purpose

was "to establish requirements, procedures, and responsibilities in the use of automated traffic enforcement systems on the primary road system" and to "ensure[] consistency statewide" in their use. *Id.* r. 761—144.1.

The IDOT rules sharply restricted the implementation of ATE systems on primary roadways. The rules directed that ATE systems were to be considered only "after other engineering and enforcement solutions have been explored and implemented" and were not to be used as a long-term solution to speeding or red-light running. *Id.* r. 761—144.4(1)(*a*)–(*b*). The rules provided that ATE systems were to be used only "in extremely limited situations on interstate roads because [such roads] are the safest class of any roadway in the state and typically . . . carry a significant amount of non-familiar motorists." *Id.* r. 761—144.4(1)(*c*). The rules further stated that ATE systems shall only be considered "in areas with a documented high-crash or high-risk location" in "[a]n area or intersection with a significant history of crashes which can be attributed to red-light running or speeding," or "[a] school zone." *Id.* r. 761—144.4(1)(*d*).

The IDOT rules contained minimum requirements for the operation of ATE systems. *Id.* r. 761—144.6. Among other requirements, the rules provided that ATE systems could not "be placed within the first 1,000 feet of a lower speed limit." *Id.* r. 761—144.6(*b*)(10). The rules required that ATE "fixed systems" be calibrated at least quarterly "by a local law enforcement officer trained in the use and calibration of the system." *Id.* r. 761—144.6(4).

The IDOT rules required that each jurisdiction with an active ATE system on primary highways prepare an annual report on the operation of the system and submit the report to the IDOT. *Id.* r. 761—144.7(1)–

(2). The local evaluation was to include (1) an analysis of the impact of the ATE system in reducing speeds or red-light running; (2) the number and type of collisions at the sites, including before-and-after implementation comparisons; (3) an evaluation of the ATE system's impact on critical safety issues; (4) the total number of citations issued during each calendar year; and (5) certification that the calibration requirements of the rule had been met. *Id.* r. 761—144.7(1)(*a*)(1)–(5).

Upon receipt of the annual report, the IDOT used the information from the report to reevaluate the continued use of the ATE system. *Id.* r. 761—144.8(1). The rules provided that continued use of the ATE system was contingent upon the effectiveness of the system, appropriate administration by the local jurisdiction, continued compliance with ATE rules, changes in traffic patterns, infrastructure improvements, and implementation of other identified safety measures. *Id.* r. 761—144.8(1)–(2). The IDOT "reserve[d] the right to require removal or modification of a system in a particular location, as deemed appropriate." *Id.* r. 761—144.8(2).

We recently considered the question of whether the IDOT had authority to promulgate its ATE rules. *See City of Des Moines v. Iowa Dep't of Transp.*, 911 N.W.2d 431 (2018). We concluded that the IDOT lacked the necessary statutory authority. *Id.* at 449–50. As a result, the IDOT rules are invalid and not enforceable in this case. Nonetheless, to the extent the studies conducted pursuant to the invalid rules relate to safety matters, we consider the findings as part of this appeal.

2. *IDOT evaluation of Cedar Rapids ATE sites on I-380.* On March 17, 2015, the IDOT issued an evaluation of Cedar Rapids' ATE program. In terms of general findings related to the ATE system on I-380, the IDOT noted that there were eighty-two crashes in 2008 and

2009 prior to ATE implementation and fifty-nine crashes in the 2012 and 2013, two years after the implementation in 2010. The IDOT report noted that the greatest area of safety concern was an "S" curve in downtown Cedar Rapids. The IDOT stressed that the dangers associated with the "S" curve, however, were in entering the "S" curve, not leaving the "S" curve. The IDOT noted, echoing its rules, that ATE systems should only be considered in "extremely limited situations on interstate roads because they are the safest class of any roadway in the state and they typically carry a significant amount of non-familiar motorists." The IDOT reported that many safety countermeasures had been added to this section of the roadway since a safety audit conducted in 2008 and published in 2009.

The IDOT report proceeded to evaluate each of the four ATE sites on I-380. With respect to the site on I-380 northbound near Diagonal Drive, the IDOT concluded that because the current equipment was located 859 feet beyond a reduction in speed limit from sixty to fifty-five miles per hour, the equipment should be moved to the next truss to the north to ensure the equipment complied with the 1000-foot requirement of rule 761—144.6(1)(*b*)(10). The IDOT evaluation came to a similar conclusion with respect to the ATE site on I-380 southbound near J Avenue. There, the ATE cameras were located 896 feet beyond a change of speed instead of the 1000 feet required by the IDOT rule.

Two other Cedar Rapids ATE sites, however, received different treatment. The IDOT evaluation concluded that the ATE site at I-380 northbound near J Avenue and the site at I-380 southbound near the lst Avenue ramp should be removed or disabled. According to the IDOT, these two ATE systems were located either well beyond or mostly beyond the area of concern presented by the "S" curve. Further, with respect to

the site at I-380 northbound near J Avenue, the IDOT found that the issuance of speeding citations in excess of 30,000 per year was "extremely high."

Cedar Rapids appealed the IDOT evaluation to the director. Cedar Rapids raised issues concerning the IDOT's legal authority to implement its ATE rules, Cedar Rapids' home rule authority, and the procedure the IDOT followed regarding its ATE rules. Cedar Rapids also appears to have asserted that the IDOT rules did not apply retroactively to ATE systems in place prior to the rules promulgation.

**E. Notices of Violations and Administrative Proceedings Involving Plaintiffs.**

1. *Jeffrey Olson.* Jeffrey Olson resides in Bloomington, Minnesota. He received a notice of violation alleging that on April 3, 2015, a vehicle owned by him violated the Cedar Rapids ATE ordinance at I-380 southbound, J Avenue exit. Olson challenged the citation.

Olson submitted a statement to Cedar Rapids detailing his reasons for contesting the charge. Olson stated that the IDOT had found the particular camera on the J Avenue exit noncompliant with state regulations and that Cedar Rapids had not remedied the noncompliance. He noted the equipment violated the regulation requiring that an ATE system not be placed within the first 1000 feet of a lower speed limit. Olson stated that he also could find no evidence that Cedar Rapids quarterly calibrated the radar and camera equipment as required by state regulations. Olson further stated that the cameras were not placed close enough to the "S" curve, a perceived safety hazard, to promote public safety.

In addition to questioning the enforcement of a citation that is based upon a noncompliant ATE site, Olson stated it was

unconstitutional to fine an owner for a moving violation without proving that the owner was, in fact, in control of and operating the vehicle at the time of the alleged violation. Further, Olson claimed it was unconstitutional to charge a driver with a moving violation without the driver being able to face and question the accuser, which is impossible with an automated system.

The administrative hearing officer rejected Olson's challenge. On a form letter headed with the address of the Cedar Rapids Police Department, Verle Allen, an "Administrative Hearing Officer," made a finding of "liable" and in notes, stated "[c]itation sustained." Olson paid the fine.

2. *Dennis Behm.* Dennis Behm resides in Atwater, Minnesota. He received a notice of violation alleging that on April 11, 2015, a vehicle owned by him operated in violation of the Cedar Rapids ATE ordinance at I-380 northbound, J Avenue exit. Behm filed a written response with Cedar Rapids, asserting that the IDOT had ordered the removal of the camera at the location. The hearing officer, Chris Mayfield, on the same form utilized in the Olson matter, found Behm "liable" and the "[c]itation sustained."

3. *Bobby Lee Langston and David Brodsky.* Bobby Lee Langston and David Brodsky reside in Iowa City, Iowa. They received two notices of violation alleging that on April 25, 2015, a vehicle they owned violated the Cedar Rapids ATE ordinance. One violation allegedly occurred at 7:30 p.m., at I-380 northbound, Diagonal Drive exit, while the other violation allegedly occurred at I-380 southbound, 1st Avenue West exit, at 8:02 p.m. Langston and Brodsky challenged the citations. Brodsky appeared at the administrative hearing.

The hearing officer, Chris Mayfield, dismissed one of the violations. With respect to the remaining violation, the hearing officer used the same form and had the same notations as other orders in which the owner was found to have violated the ordinance and the citation was sustained.

4. *Geoff Smith.* Geoff Smith resides in Aloha, Oregon. He received two notices of violation alleging that on June 8, 2015, a vehicle owned by him violated the Cedar Rapids ATE ordinance at I-380 northbound, Diagonal Drive exit, and again two minutes later, at I-380 northbound, J Avenue exit. He challenged the violations. At the administrative hearing, hearing officer Verle Allen found Smith "liable" for one violation, but the other violation does not appear to have been addressed. Smith paid the fine.

5. *Burton Brooks.* Burton Brooks resides in Putnam, Illinois. He received a notice of violation alleging a speeding event on June 19, 2015, at I-380 southbound, J Avenue exit. He contested the violation. In a written submission, he stated he was a disabled American veteran on vacation with his wife when he drove through Cedar Rapids. He stated that he made a habit of observing the speed limit as demonstrated by the fact that he had not received a speeding ticket in thirty years. He suggested that the camera malfunctioned or that, as a stranger to Cedar Rapids, he did not have enough time to adjust to the speed limit. He asked that the matter be dismissed and promised "to be aware next time I vacation in your beautiful city."

Hearing officer Chris Mayfield dismissed the citation, stating, "[E]vidence shown could not prove the citizen's fault." The hearing officer offered some friendly advice, namely "warning, please slow down."

**F. Overview of Plaintiffs' Petition.** The plaintiffs filed an action in district court challenging the lawfulness of the Cedar Rapids ATE

ordinance. Article I, count I of the petition sought a declaratory judgment against the City. Article I, count I is a sprawling pleading that includes at least eight often overlapping and interwoven constitutional and statutory claims.

The plaintiffs first assert a statutory claim that the ATE system with its administrative hearing approach provides an irreconcilably different process than the small claims approach for municipal infractions, which they assert Iowa Code section 602.6101 requires. Section 602.6101 provides that the district court "has exclusive, general, and original jurisdiction of all actions . . . except in cases where exclusive or concurrent jurisdiction is conferred on some other court, tribunal, or administrative body." Iowa Code § 602.6101.

The plaintiffs further assert that the ATE system and its administrative hearing is irreconcilable with Iowa Code section 364.22(6). Section 364.22(2) states "[a] city by ordinance may provide that a violation of an ordinance is a municipal infraction." Id. § 364.22(2). Iowa Code section 364.22(6) then provides that a municipal infraction is to be tried in district court "in the same manner as a small claim," and "the city has the burden" to prove the violation occurred by "clear, satisfactory, and convincing evidence."

Next, the plaintiffs allege numerous violations of the equal protection clause and the privileges and immunities clause of article I, section 6 of the Iowa Constitution. The plaintiffs assert the ATE system treats various classes of Iowa citizens and out-of-state citizens differently in violation of the fundamental right to travel, which plaintiffs claim triggers strict scrutiny. The plaintiffs allege that the use of the National

Law Enforcement Telecommunications System database (Nlets),[2] where the license plates of various vehicles such as semi-trailer trucks and government-owned vehicles have been "suppressed," is a violation of equal protection. The plaintiffs allege a violation of the Iowa privileges and immunities clause because the "compressed distances" between the change in speed limits and the location of the cameras has a disproportionate impact on out-of-state drivers.

The plaintiffs' petition alleges due process violations under the Iowa Constitution "due to the scheme's many failures." Among other things, they assert that due process violations arise because the camera placements are not sufficiently advertised to the public, the camera placements are in areas not correlated with significant safety issues, owners of cited vehicles lack actual notice of all reasonable and applicable defenses, and owners of cited vehicles lack notice of the availability of direct access to the Iowa courts with respect to alleged ATE violations. The plaintiffs also claim the ATE system violates the Iowa Constitution—apparently due process—because it has continued to operate in violation of the IDOT's administrative rules and regulations and corresponding evaluation order and is therefore "invalid as the State has presumptively held that there is no legitimate state interest in the operation of these cameras."

Based on the above theories, the plaintiffs sought relief beyond a declaratory ruling. The plaintiffs also sought certification of classes of vehicle owners, damages against the defendants for claims arising under the Iowa Constitution, a refund of amounts paid to Cedar Rapids and

---

[2]Nlets is a law-enforcement database maintained by the International Justice and Public Safety Network. *Nlets*, https://www.nlets.org/ (last accessed July 25, 2018).

Gatso under an unjust enrichment theory, and temporary and permanent injunctive relief.

**G. District Court Ruling on Summary Judgment.** The City moved for summary judgment on all issues. The district court granted the motion.

With respect to the Iowa constitutional claims based on substantive due process, equal protection, and privileges and immunities, the district court recognized federal caselaw held the right to interstate travel was fundamental under the United States Constitution and assumed a fundamental right to intrastate travel under the Iowa Constitution. Citing federal caselaw, the court concluded the plaintiffs failed to show the directness and substantiality required for an infringement of the fundamental right to travel and, as a result, the challenges to the ordinance and its implementation based on substantive due process, equal protection, and privileges and immunities would be evaluated using a rational basis test. *See Hughes v. City of Cedar Rapids*, 112 F. Supp. 3d 817, 839 (N.D. Iowa 2015) (concluding that in order to show the fundamental right to travel has been infringed, the court looks to "[t]he directness and substantiality of the interference with the fundamental right at issue" (quoting *Zablocki v. Redhail*, 434 U.S. 374, 387 N.12, 98 S. Ct. 673, 681 n.12 (1978))), *aff'd in part, rev'd in part*, 840 F.3d 987 (8th Cir. 2016).

In applying the rational basis test, the district court emphasized that under principles described in a trio of cases, the challenger had to negate every reasonable basis upon which the legislation may be sustained, *see Varnum v. Brien*, 763 N.W.2d 862, 879 (Iowa 2009), the legitimate government interest in the ordinance may be sufficient if it is "realistically conceivable," *Racing Ass'n of Cent. Iowa v. Fitzgerald* (*RACI*

*II*), 675 N.W.2d 1, 7 (Iowa 2004) (emphasis omitted) (quoting *Miller v. Boone Cty. Hosp.*, 394 N.W.2d 776, 779 (Iowa 1986)), and a significant degree of underinclusiveness and/or overinclusiveness is tolerated, *Vance v. Bradley*, 440 U.S. 93, 108–09, 99 S. Ct. 939, 948 (1979). Citing *King v. State*, 818 N.W.2d 1, 32 (Iowa 2012), the court noted that typically the rational basis test for equal protection is also applied with respect to a substantive due process analysis.

Applying these principles, the district court rejected the substantive due process, equal protection, and privileges and immunities claims. Relying on *Hughes*, the court concluded that the City could rationally conclude that the system would reduce the number of people violating traffic laws while simultaneously raising funds for the City. *See* 112 F. Supp. 3d at 840. The court further noted that Cedar Rapids could rationally conclude that a system that only photographs rear license plates is less expensive and that capturing fewer people who violate the ordinance with a less expensive system is more cost-effective. The district court concluded that the "minor degree of underinclusiveness" caused by the resulting exemption of semi-trailer trucks and government-owned vehicles from the threat of ATE citation was insufficient to render the ordinance unconstitutional under due process, equal protection, and privileges and immunities theories.

The district court recognized that the IDOT had determined that the equipment placed at the I-380 locations was not necessary for public safety. Even so, the court reasoned, the City has a legitimate interest in enforcing the speed limit within the City limits and the ATE system is rationally related to that interest. In any event, the court stated that the IDOT is not the final arbiter of the constitutional legitimacy of the ordinance.

The district court rejected the plaintiff's procedural due process claim along the same lines as the federal district court in *Hughes*, 112 F. Supp. 3d 817. Applying the balancing test of *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 903 (1976), the court observed that a civil fine of between $25 and $750 was not a particularly weighty property interest. The court noted that the risk of erroneous deprivation was slight given the two options in the ordinance to contest the fine. Further, the court concluded that requiring the government to allow citations to be contested only through the court system would impose a significant additional workload on already burdened state courts.

The district court also rejected the plaintiffs' unlawful-delegation-of-power claim. According to the court, Gatso's initial screening process involved little discretion and the plaintiffs did not provide facts indicating otherwise. The court further noted that it did not find admissible evidence showing the acts of running license plate numbers to identify registered vehicle owners, calibrating the ATE equipment, mailing out notices, or maintaining Cedar Rapids' ATE hotline or webpage involved significant discretion on Gatso's part. Further, the court noted that Cedar Rapids police officers were responsible for the ultimate decision regarding who was issued ATE citations.

The district court next addressed the plaintiffs' argument that provisions of Iowa law preempted the administrative remedies in the ordinance. The court rejected the claim, emphasizing that the ATE ordinance is not preempted by Iowa Code section 364.22(4), (6) and section 602.6101 because the ordinance simply provides plaintiffs with an additional forum to challenge the ATE citations. The court, however, did not address the claim that the IDOT's regulations preempted the City's actions.

Finally, the district court addressed the plaintiffs' unjust enrichment claim. The court concluded that because the ordinance was constitutional, there was no basis for an unjust enrichment claim.

Plaintiffs appealed. We transferred the case to the court of appeals.

**H. Court of Appeals Opinion.** The court of appeals affirmed, generally applying reasoning similar to the district court. With respect to plaintiffs' claim that Iowa statutes preempted the ordinance, however, the court of appeals engaged in additional analysis. The court noted the argument was based upon implied rather than express preemption. The court recognized that a municipality cannot enact an ordinance that expressly or impliedly conflicts with state law. *See City of Sioux City v. Jacobsma*, 862 N.W.2d 335, 353 (Iowa 2015). The court, however, cited federal authority for the proposition that the ATE ordinance was not impliedly preempted. *See Brooks v. City of Des Moines*, 844 F.3d 978, 980 (8th Cir. 2016); *Hughes*, 112 F. Supp. 3d at 849. Further, the court of appeals also cited *City of Davenport v. Seymour*, 755 N.W.2d 533, 542 (Iowa 2008), and *Goodell v. Humboldt County*, 575 N.W.2d 486, 500 (Iowa 1998), for the proposition that an exercise of city power is not inconsistent with state law unless it is irreconcilable with state law. Relying on these principles, the court of appeals found no implied preemption.

**II. Standard of Review.**

A motion for summary judgment is appropriately granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3). "We review the legal issues necessary for resolution of the constitutional claims presented within the context of the summary

judgment proceeding de novo." *Varnum*, 763 N.W.2d at 874; *Kistler v. City of Perry*, 719 N.W.2d 804, 805 (Iowa 2006). We review all other legal issues for correction of errors at law. *Mueller v. Wellmark, Inc.*, 818 N.W.2d 244, 253 (Iowa 2012).

The burden of showing undisputed facts entitled it to summary judgment rests on the moving party. *See, e.g., Swainston v. Am. Family Mut. Ins.,* 774 N.W.2d 478, 481 (Iowa 2009) (stating "the moving party must affirmatively establish the existence of undisputed facts entitling that party to a particular result" (quoting *Interstate Power Co. v. Ins. Co. of N. Am.*, 603 N.W.2d 751, 756 (Iowa 1999)); *K & W Elec., Inc. v. State*, 712 N.W.2d 107, 112 (Iowa 2006) (same); *Red Giant Oil Co. v. Lawlor*, 528 N.W.2d 524, 528 (Iowa 1995) ("The burden is on the moving party to show the absence of a material fact issue . . . ."). This burden remains with the moving party at all times. *Interstate Power*, 603 N.W.2d at 756. A moving party cannot shift the burden to the other party through a conclusory motion for summary judgment not supported by undisputed facts. *See id.*; *Midwest Mgmt. Corp. v. Stephens*, 291 N.W.2d 896, 900 (Iowa 1980) (noting the other party need not file a resistance to a motion for summary judgment to prevail if the moving party has not met its burden to show the absence of a genuine issue); *Am. Tel. & Tel. Co. v. Dubuque Commc'ns Corp.*, 231 N.W.2d 12, 15 (Iowa 1975) ("A summary judgment is neither a method of avoiding the necessity of proving one's case nor a clever procedural gambit whereby a claimant can shift to his adversary his burden of proof on one or more issues." (quoting *United States v. Dibble*, 429 F.2d 598, 601 (9th Cir. 1970))).

### III. Overview of Controversy Surrounding ATE Systems.

In recent decades, many cities across the country have implemented ATE systems. ATE systems have proven quite

controversial. Advocates say that ATE systems are efficient and promote public safety, while opponents view ATE systems as simply a money grab by cash-strapped municipalities, assisted by private vendors seeking to promote profits and not public safety. Academic commentators have joined the fray with gusto. *See, e.g.*, Andrew Askland, *Photo Radar Enforcement: A Brief Stall on a Slippery Slope?*, 19 B.U. J. Sci. & Tech. L. 1, 4–7 (2013) [hereinafter Askland]; Jennifer M. Lancaster, Case Note, *You've Got Mail: Analyzing the Constitutionality of Speeding Cameras in* City of Moline Acres v. Brennan, *470 S.W.3d 367 (Mo. 2015),* 41 S. Ill. U. L.J. 485, 502 (2017); Paul McNaughton, Comment, *Photo Enforcement Programs: Are They Permissible Under the United States Constitution?*, 43 J. Marshall L. Rev. 463, 489 (2010); Kevin P. Shannon, Note, *Speeding Towards Disaster: How Cleveland's Traffic Cameras Violate the Ohio Constitution,* 55 Clev. St. L. Rev. 607, 635–36 (2007); Thomas M. Stanek, Note, *Photo Radar in Arizona: Is it Constitutional?*, 30 Ariz. St. L.J. 1209, 1243 (1998).

Plaintiffs have attacked ATE systems in beehive litigation with statutory and constitutional theories. Plaintiffs have asserted that substantive and notice provisions of ATE systems are preempted by state law or that the ATE systems otherwise violate provisions of state law. *See, e.g., Leonte v. ACS State & Local Sols., Inc.,* 19 Cal. Rptr. 3d 879, 883–84 (Ct. App. 2004); *State v. Kuhlman,* 729 N.W.2d 577, 579 (Minn. 2007); *Mendenhall v. City of Akron,* 881 N.E.2d 255, 260 (Ohio 2008); *cf. City of Commerce City v. State,* 40 P.3d 1273, 1277–78 (Colo. 2002) (en banc). Plaintiffs have claimed that ATE systems amount to an unlawful tax under state law. *See Ballard v. City of Creve Coeur*, 419 S.W.3d 109, 122 (Mo. Ct. App. 2013) (successfully overturning a motion to dismiss on the issue). Plaintiffs have attacked ATE systems for failure to comply

with notice and remedial provisions of state law. *See, e.g., Tonner v. Paradise Valley Magistrate's Ct.*, 831 P.2d 448, 450 (Ariz. Ct. App. 1992) (holding notice of ticket must meet statutory requirements for service); *City of Moline Acres v. Brennan*, 470 S.W.3d 367, 382 (Mo. 2015) (en banc) (finding notice demanding payment an unlawful "shortcut around the judicial system"); *City of Springfield v. Belt*, 307 S.W.3d 649, 653 (Mo. 2010) (en banc) (holding proceeding overseen by "hearing examiner" violates statutory requirement that municipal ordinance violations be heard before divisions of circuit court); *Walker v. City of Toledo*, 39 N.E.3d 474, 480 (Ohio 2014) (holding municipal courts do not have exclusive authority over traffic-ordinance violations). Plaintiffs have raised a wide variety of constitutional attacks, including substantive and procedural due process, equal protection, and delegation of powers. *See, e.g., Hughes*, 840 F.3d at 996; *Bevis v. City of New Orleans*, 686 F.3d 277, 280–81 (5th Cir. 2012); *Idris v. City of Chicago*, 552 F.3d 564, 565 (7th Cir. 2009); *Falkner v. City of Chicago*, 150 F. Supp. 3d 973, 976 (N.D. Ill. 2015); *Leder v. Am. Traffic Sols., Inc.*, 81 F. Supp. 3d 211, 223 (E.D.N.Y. 2015); *Gardner v. City of Cleveland*, 656 F. Supp. 2d 751, 758, 760 (N.D. Ohio 2009); *Sevin v. Parish of Jefferson*, 621 F. Supp. 2d 372, 384–85 (E.D. La. 2009); *Shavitz v. City of High Point*, 270 F. Supp. 2d 702, 707 (M.D.N.C. 2003); *Agomo v. Fenty*, 916 A.2d 181, 183 (D.C. 2007); *City of Hollywood v. Arem*, 154 So. 3d 359, 365 (Fla. Dist. Ct. App. 2014), *disapproved of by Jimenez v. State* (*Jimenez II*), 246 So. 3d 219 (Fla. 2018); *Fischetti v. Village of Schaumburg*, 967 N.E.2d 950, 959 (Ill. App. Ct. 2012).

The controversy over ATE systems has drawn legislative as well as judicial attention. Some states, like Iowa, have declined to enact specific statewide regulation of ATE systems. *See, e.g., Pepper v. St. Charles*

*County*, 517 S.W.3d 590, 598 (Mo. Ct. App. 2017); *Walker*, 39 N.E.3d at 479. *See generally* Jeffrey A. Parness, *Beyond Red Light Enforcement Against the Guilty but Innocent: Local Regulations of Secondary Culprits*, 47 Willamette L. Rev. 259, 265 (2011). Other states have taken the opposite approach and banned them. *See* Mont. Code Ann. § 61-8-206 (West, Westlaw current through 2017 Sess.). A number of other states have adopted a regulatory approach that permits ATE systems under certain circumstances. In states that have adopted a regulatory approach, the statutes deal with a wide variety of ATE issues. The statutes address issues such as the permissible location of ATE systems, their manner of operation, the notices required to support an ATE system, and the manner in which vendors who participate in ATE systems may be compensated. *See, e.g.*, Ark. Code Ann. § 27-52-110(c)(1) (West, Westlaw current through 2018 Fiscal Sess. & 2d Extraordinary Sess.) (limiting placement to school zones and railroad crossings); Colo. Rev. Stat. Ann. § 42-4-110.5 (West, Westlaw current through 2018 2d Reg. Sess.) (requiring sign placement in conspicuous places not fewer than 200 feet and no more than 500 feet before automated vehicle identification system); Fla. Stat. Ann. § 316.0083 (West, Westlaw current through 2018 2d Reg. Sess.) (authorizing notice by first class mail and prohibiting fees based on tickets issued), *held unconstitutional as applied in City of Fort Lauderdale v. Dhar*, 185 So. 3d 1232, 1236 (Fla. 2016); N.C. Gen. Stat. Ann. § 160A-300.1 (authorizing first-class notice).

We have had two occasions to consider the validity of ATE systems. In *Seymour*, we considered whether ATE systems were impliedly preempted by provisions of Iowa law related to traffic regulation under

Iowa Code chapter 321. 755 N.W.2d at 535. We concluded that they were not. *Id.*

In *Jacobsma*, we considered a number of questions related to an ATE system in Sioux City. 862 N.W.2d at 337. We upheld an ATE system that established a rebuttable presumption that the vehicle's owner was the driver from an Iowa and federal due process attack. *Id.* at 339, 346. Citing *RACI II*, we rejected a substantive due process attack, noting that the plaintiff had not developed a record suggesting that the city's interest was "insubstantial or empirically unsustainable." *Jacobsma*, 862 N.W.2d at 347–48; *see RACI II*, 675 N.W.2d at 74. We also rejected an attack on the Sioux City ATE system under the inalienable rights clause of article I, section 1 of the Iowa Constitution. *Jacobsma*, 862 N.W.2d at 352–53.

**IV. Substantive Iowa Constitutional Challenges: Substantive Due Process, Equal Protection, and Privileges and Immunities.**

**A. Introduction.** In this case, plaintiffs launch their equal protection, privileges and immunities, and substantive due process claims under the Iowa Constitution. They seek monetary, declaratory, and injunctive relief on these theories. Plaintiffs do not make parallel claims under the United States Constitution.

As presented by the plaintiffs, the three state constitutional claims of equal protection, privileges and immunities, and substantive due process are closely interwoven. Plaintiffs, as well as the defendants, do not utilize a different framework for analysis of equal protection and privileges and immunities. There is Iowa authority for this proposition. *See Perkins v. Bd. of Supervisors*, 636 N.W.2d 58, 73 (Iowa 2001). In light of the positions of the parties, we have no occasion to consider whether these claims should be pulled apart.

Further, while their substantive due process claims attack the ATE system as a whole and do not involve classifications, the plaintiffs employ a tiered framework for substantive due process that is indistinguishable from their approach to the equal protection and privileges and immunities claims. As a result, the analysis of substantive due process as presented by the parties has substantial overlap with the equal protection and privileges and immunities claims.

The tiered approach to these constitutional provisions is a familiar one that has been employed by the United States Supreme Court for some time. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440–41, 105 S. Ct. 3249, 3254–55 (1985). The tiered approach of the United States Supreme Court has its critics. For instance, critics have noted the variability in the application of the rational basis test, where in some cases it is extraordinary deferential, in other cases it is notably more demanding. *See, e.g., Jacobsma*, 862 N.W.2d at 347 n.3; *County of Portage v. Steinpreis*, 312 N.W.2d 731, 741 n.4 (Wis. 1981) (Abrahamson, J., dissenting); Kenji Yoshino, *The New Equal Protection*, 124 Harv. L. Rev. 747, 759 (2011) [hereinafter Yoshino] (noting that rational basis review takes two forms, ordinary rational basis review and rational basis review "with bite"). It has been suggested that the United States Supreme Court abandon, or at least refine, its tiered approach. Jeffrey M. Shaman, *Equality and Liberty in the Golden Age of State Constitutional Law* 13 (2008) (noting "multi-tier system has proven to be unduly rigid").

There is, of course, no requirement that states recognize as "fundamental" only those interests so recognized by the United States Supreme Court in its constitutional analysis. While the United States Supreme Court has rejected the right to education as a "fundamental interest," *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 37, 93

S. Ct. 1278, 1299 (1973), other states (not including Iowa), have declined to follow the Supreme Court's lead, *see, e.g., Serrano v. Priest*, 557 P.2d 929 (Cal. 1976) (en banc) (reaffirming under state constitution "education is a fundamental interest"); *Idaho Sch. for Equal Educ. Opportunity v. Evans*, 850 P.2d 724, 734–35 (Idaho 1993) (applying intermediate standard of review to equal protection challenge under state constitution); *Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391, 392 (Tex.1989) (finding constitutional mandate under state constitution to provide for education); *see also Lake View Sch. Dist. No. 25 v. Huckabee*, 91 S.W.3d 472, 479 (Ark. 2002) ("Nevertheless, because we conclude that the clear language of Article 14 imposes upon the State an absolute constitutional duty to educate our children, we conclude that it is unnecessary to reach the issue of whether a fundamental right is also implied.").

A number of states have adopted different tests for substantive due process and equal protection claims under their state constitutions when fundamental interests are not implicated. For instance, in South Dakota, the rational basis test utilized in substantive due process requires "a real and substantial relation" between a statute and the objects sought to be obtained. *Katz v. S.D. Bd. of Med. & Osteopathic Exam'rs*, 432 N.W.2d 274, 278 & n.6 (S.D. 1988). The New Jersey Supreme Court has rejected the federal approach in favor of a balancing test. *See Planned Parenthood of Cen. N.J. v. Farmer*, 762 A.2d 620, 633–38 (N.J. 2000). The Minnesota Supreme Court has been unwilling to hypothesize a rational basis not asserted in support of a statute, has required that statutory distinctions "must be genuine and substantial," and has stated that there must be "a reasonable connection between the actual . . . effect of the challenged classification and the statutory goals."

*State v. Russell*, 477 N.W.2d 886, 888–89 (Minn. 1991) (first quoting *Wegan v. Village of Lexington*, 309 N.W.2d 273, 280 (Minn. 1981)). The Supreme Courts of Alaska and Vermont have adopted a sliding-scale-type approach to equal protection that can lead to a more stringent review when fundamental interests are not involved. *See Alaska Pac. Assurance Co. v. Brown*, 687 P.2d 264, 269 (Alaska 1984); *Baker v. State*, 744 A.2d 864, 873 (Vt. 1999). A body of the academic literature has long recognized and often advocated that states may develop their own equal protection and substantive due process doctrine. *See, e.g.*, Randal S. Jeffrey, *Equal Protection in State Courts: The New Economic Equality Rights*, 17 Law & Ineq. 239, 356–57 (1999); Jeffrey M. Shaman, *The Evolution of Equality in State Constitutional Law*, 34 Rutgers L.J. 1013, 1121–23 (2003); Robert F. Williams, *Equality Guarantees in State Constitutional Law*, 63 Tex. L. Rev. 1195, 1222–24 (1985).

In this case, however, the plaintiffs cite and extensively rely upon[3] *RACI II* for the proposition that "the claimed state interest must be

---

[3]In many equal protection and substantive due process cases, litigants simply do not argue for a different approach under the Iowa Constitution than the prevailing approach under the Federal Constitution. *See, e.g.*, *In re Det. of Hennings*, 744 N.W.2d 333, 339–40 (Iowa 2008) (delaying any consideration of independent state constitutional standard in light of minimal briefing); *State v. Simmons*, 714 N.W.2d 264, 271 (Iowa 2006) (specifically recognizing that independent state constitutional claim was not briefed); *Sanchez v. State*, 692 N.W.2d 812, 819 (Iowa 2005) (noting that neither party argued for a different standard); *Claude v. Guar. Nat'l Ins.*, 679 N.W.2d 659, 664 n.3 (Iowa 2004) (making specific reference to lack of briefing on independent state constitutional approach). In these cases, we do not "adopt" the federal interpretation under the Iowa Constitution, but simply decide the issue as framed by the parties. *Haskenhoff v. Homeland Energy Sols.*, LLC, 897 N.W.2d 553, 614 (Iowa 2017) (Appel, J., concurring in part and dissenting in part) ("When a legal principle is embraced by the parties by agreement and is not contested on appeal, the court's subsequent recitation of the legal principle is not a holding in the case that was a product of an adversary proceeding."); *see also Freeman v. Grain Processing Corp.*, 848 N.W.2d 58, 93 (Iowa 2014) ("[W]here a party does not suggest a different standard under Iowa law, we adopt *for the purposes of the case* the federal standard . . . ." (Emphasis added.)).

'realistically conceivable' " and have a "basis in fact."[4]  675 N.W.2d at 7–8 (emphasis omitted) (first quoting *Miller*, 394 N.W.2d at 779).  In *Racing Ass'n of Central Iowa v. Fitzgerald* (*RACI I*), we originally held that the legislature's classification in a taxation statute between land-based casinos and riverboats violated equal protection under the Fourteenth Amendment of the United States Constitution.  648 N.W.2d 555, 558, 562 (Iowa 2002).  The United States Supreme Court reversed.  *Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 110, 123 S. Ct. 2156, 2161 (2003).  On remand, we held that, notwithstanding the unanimous decision of the United States Supreme Court under the Equal Protection Clause of the Fourteenth Amendment, the classification was nonetheless invalid under article I, section 6 of the Iowa Constitution.  *RACI II*, 675 N.W.2d at 3.  Clearly, our approach to equal protection in *RACI II* had more teeth than that employed by the United States Supreme Court.

An important question in equal protection and due process settings is the role of fact-finding in determining the validity of the classification or legislation.  *RACI II* emphasizes that the legitimate purpose of the classification must be "realistically conceivable" and have "a basis in fact."  *Id.* at 7–8 (emphasis omitted) (first quoting *Miller*, 394 N.W.2d at 779).  On the other hand, we have stated that government "is not required or expected to produce evidence to justify its legislative action."  *Horsfield Materials, Inc. v. City of Dyersville*, 834 N.W.2d 444, 458 (Iowa 2013) (quoting *Ames Rental Prop. Ass'n v. City of Ames*, 736 N.W.2d 255, 259 (Iowa 2007)).

---

[4]Plaintiffs also cite *Jacobsma* for the proposition that the rational basis test may be applied more stringently or with "greater bite" under Iowa's due process clause than under federal caselaw.  862 N.W.2d at 347 n.3

We think *RACI II* and *Horsfield* may be easily reconciled. While the state or municipality is not expected or required to produce evidence to justify its action, a party attacking the classification may do so in an effort to show that the claimed legitimate interest is either not "realistically conceivable" or does not have "a basis in fact." *RACI II*, 675 N.W.2d at 7–8 (emphasis omitted) (first quoting *Miller*, 394 N.W.2d at 779). In other words, once the state articulates a legitimate governmental interest that appears plausible on the face of the statute, the burden of coming forward with evidence to attack the asserted justification shifts to the challenger.

Our cases support the potential role of fact-finding in the arsenal of a party attacking legislation under substantive due process, equal protection, or privileges and immunities. Decades ago, we repeatedly noted that changes in circumstances can allow us to find that a statute is no longer rationally related to its original government purpose. *Miller*, 394 N.W.2d at 779 (rejecting claimed purposes "[i]n light of present day conditions"); *Bierkamp v. Rogers*, 293 N.W.2d 577, 581 (Iowa 1980) (noting "the passage of time may call for a less deferential standard of review as the experimental or trial nature of legislation is less evident"). More recently, in *State v. Willard*, we noted that the challenger had not "developed an evidentiary basis for this court to conclude the statute fails to promote a legitimate government interest." 756 N.W.2d 207, 213–14 (Iowa 2008). In *Ames Rental Property*, we noted that a legislative judgment "is presumed to be supported by facts known to the [legislature] unless facts judicially known or proved preclude that possibility." 736 N.W.2d at 259–60.

Our approach in these cases is consistent with equal protection and due process authorities in other states. A number of states require

robust fact-finding in order to evaluate state constitutional challenges to residency requirements, gay adoptions, and stiff cocaine penalties. *See, e.g.*, *Bruno v. Civil Serv. Comm'n*, 440 A.2d 155, 157 (Conn. 1981) (noting deficiency in record involving challenge to residential duration requirement); *Cox v. Fla. Dep't of Health & Rehab. Servs.*, 656 So. 2d 902, 903 (Fla. 1995) (remanding for "a factual completion of the record" on challenge to state ban on gay adoptions); *State v. Frazier*, 649 N.W.2d 828, 833–35 (Minn. 2002) (requiring a factual record to evaluate the reliability and validity of both data and data analysis presented by the parties).

There is also support for the position in the academic literature. As noted by one commentator, adjudicative facts

> must focus on both the importance of policy and its motivation . . . .
>
> . . . Adjudicative facts for a particular program would be part of the calculus and would be useful in determining the sincerity of the government objective and smoking out any illicit motives.

Angelo N. Ancheta, *Science and Constitutional Fact Finding in Equal Protection Analysis*, 69 Ohio State L.J. 1115, 1166, 1169 (2008).

While there is a role for factual development in Iowa equal protection, privileges and immunities, and substantive due process cases, the role of fact-finding in a rational basis review is limited. The fact-finding is not a robust review where the court substitutes its policy judgments for that of the legislature. Instead, the fact-finding is limited to considering whether the asserted purposes of the statute, in light of the record developed, are realistically conceivable and have a basis in fact, and whether the means chosen are rationally related to that legitimate purpose. *See RACI II*, 675 N.W.2d at 7–8. In the vernacular of

*RACI II*, the rational basis review of classifications is not "toothless" in the face of strong evidence undermining the legislative means and purposes, but it is deferential to legislative judgments. *Id.* at 9. We give the legislature substantial leeway, particularly in matters involving highway regulation and safety, but there are judicial guardrails on legislative action even when applying a rational basis review. *Compare Veach v. Iowa Dep't of Transp.*, 374 N.W.2d 248, 249, 250 (Iowa 1985) (concluding under rational basis test that "State's interest in public safety is substantially served by treating people who refuse chemical testing differently from people who submit to testing"), *with Bierkamp*, 293 N.W.2d at 582 (concluding no rational relationship existed between the classifications drawn in the guest statute and its conceivable purposes of promoting hospitality among automobile drivers and preventing collusive lawsuits and therefore statute violative of equal protection under the Iowa Constitution).

**B. Infringement of Fundamental Right to Travel by ATE System.**

1. *Introduction.* An important threshold question for equal protection, privileges and immunities, and substantive due process analyses is whether the ATE system in this case infringes on a fundamental right to intrastate travel. The parties appear to concede that if this is so, the ATE system and its classifications would be subject to strict scrutiny. On the other hand, if a fundamental right is not implicated, the ATE system is subject to a less intrusive rational basis test.

2. *Positions of the parties.* Plaintiffs assert that the ATE system infringes upon the fundamental right to travel under the Iowa Constitution. Plaintiffs note that the fundamental right to interstate

travel is well established. *See Formaro v. Polk County*, 773 N.W.2d 834, 839 (Iowa 2009). Plaintiffs assert that the cameras on I-380 do not provide sufficient notice to strangers to Cedar Rapids and that out-of-state travelers are not treated as welcome visitors. Plaintiffs assert that out-of-state travelers have a fundamental right not to be subject to a speed trap in Cedar Rapids, a speed trap whose burdens fall disproportionately and irrationally, according to plaintiffs, on out-of-state citizens.

Further, according to the plaintiffs, there is also a fundamental right to *intrastate* travel. Plaintiffs recognize that while Iowa has not yet expressly adopted a fundamental right to intrastate travel, they urge us to do so. Plaintiffs claim that a right to travel may be found in the Iowa Constitution in the privileges and immunities clause of article I, section 6. Plaintiffs note that a number of states in the Midwest and West have embraced a constitutional right to intrastate travel. *See, e.g., Treacy v. Municipality of Anchorage*, 91 P.3d 252, 264–65 (Alaska 2004); *State v. Cuypers*, 559 N.W.2d 435, 437 (Minn. Ct. App. 1997); *In re Marriage of Guffin*, 209 P.3d 225, 227–28 (Mont. 2009); *State v. Burnett*, 755 N.E.2d 857, 865 (Ohio 2001); *Brandmiller v. Arreola*, 544 N.W.2d 894, 899 (Wis. 1996). The plaintiffs' citations include descriptions of the right as including the right "to move from place to place, to walk in the fields in the country or on the streets of a city, [and] to stand under open sky." *State v. Shigematsu*, 483 P.2d 997, 1001 (Haw. 1971).

Cedar Rapids concedes, as it must, the existence of a fundamental right to interstate travel. Cedar Rapids, however, claims that even if the right exists, it is not infringed by the ATE system. Cedar Rapids notes that right-to-travel cases generally embrace three components—(1) the right to leave and enter a state, (2) "the right to be treated as a welcome

visitor rather than an unfriendly alien," and (3) the right to be treated like other citizens after becoming a permanent resident. *Formaro*, 773 N.W.2d at 839 (quoting *Saenz v. Roe*, 526 U.S. 489, 500, 119 S. Ct. 1518, 1525 (1999)).

Cedar Rapids contends none of these components are infringed on the record developed in this case. Cedar Rapids suggests ordinary traffic regulations do not infringe the right to travel. *See United States v. Hare*, 308 F. Supp. 2d 955, 1001 (D. Neb. 2004). Further, Cedar Rapids points out that not everything that deters travel burdens the fundamental right to travel. *See Matsuo v. United States*, 586 F. 3d 1180, 1183 (9th Cir. 2009). Cedar Rapids argues that the notice posted on I-380 of the presence of traffic cameras is exactly the same for out-of-state, in-state, and local residents. It further does not serve to make nonresidents unwelcome visitors and does not discriminate against nonresidents.

With respect to the right to intrastate travel, Cedar Rapids points out that we declined to recognize such a right in *City of Panora v. Simmons*, 445 N.W.2d 363, 367, 369 (Iowa 1989). In any event, Cedar Rapids contends that the ATE system no more infringed the right to intrastate travel than the right to interstate travel.

3. *Discussion.* On the question of whether the ATE ordinance infringed a fundamental right to interstate or intrastate travel, we agree with Cedar Rapids. Like the district court, we assume that rights to interstate and intrastate travel are fundamental and, if infringed, may give rise to strict scrutiny under equal protection and substantive due process.

But we do not find the ATE ordinance in this case infringed any right to travel. The term "infringement" in this context is a term of art with at least some ambiguity, but it clearly does not mean anything that

impacts travel. *See Matsuo*, 586 F.3d at 1184. Yet, if traffic regulations infringed the right to travel, there could be no traffic regulations. No one, however, can seriously question the power of the state or a municipality to impose speed limits on public highways. *See Moore v. Supreme Ct.*, 447 F. Supp. 527, 531 (D.S.C. 1977) (noting that while a sales tax or speed limit may influence decisions on whether to travel to a state, such statutes do not directly impinge on the fundamental right). Speed limits do not have the function or purpose of penalizing or discouraging travel itself and ordinarily do not impose substantial burdens on the traveling public. *See Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991) (emphasizing minor restrictions on travel do not amount to denial of a fundamental right). It is not surprising that courts that have considered the validity of ATE systems have not found the right to travel infringed by their enforcement. *See Hughes*, 840 F.3d at 995.

For the above reasons, we conclude that there is no basis to examine the constitutional validity of the ATE system using strict scrutiny arising from alleged infringement of the right to intrastate or interstate travel. Instead, we apply the *RACI II* rational basis test "with bite." *See* Yoshino, 124 Harv. L. Rev. at 759.

### C. Substantive Due Process.

1. *Introduction.* We now turn to the question of whether the ATE system violates substantive due process as the plaintiffs' claim. Under substantive due process, some government deprivations of life, liberty, or property may be unconstitutional regardless of the adequacy of the procedures deployed. *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992).

Like its cousin equal protection, substantive due process is most robust when fundamental interests are involved.[5]  *State v. Klawonn*, 609 N.W.2d 515, 519 (Iowa 2000).  Here, however, we have determined that there is no fundamental interest in the right to travel infringed by the ordinance.  As a result, Cedar Rapids is not required to show a compelling interest or that the means chosen to promote that interest are narrowly tailored to achieve its objectives.

There are, however, two strands of traditional substantive due process that have potential application in this case.  First, in evaluating government legislation that involves a life, liberty, or property interest, there must be a reasonable fit between the government purpose and the means chosen to advance that purpose.  *Reno v. Flores*, 507 U.S. 292, 305, 113 S. Ct. 1439, 1448–49 (1993).  Evaluating this fit ordinarily involves application of the rational basis test.  *Gardner*, 656 F. Supp. 2d at 761.

Second, a violation of substantive due process may arise from government action that "shocks the conscience."  *Zaber v. City of Dubuque*, 89 N.W.2d 634, 640 (Iowa 2010) (quoting *Atwood v. Vilsack*, 725 N.W.2d 641, 647 (Iowa 2006)).  The classic case applying the shocks-the-conscience component of substantive due process is *Rochin v. California*, where government authorities brutally pumped the stomach of a resisting suspect for evidence of a crime during a warrantless search. 342 U.S. 165, 166, 172, 72 S. Ct. 205, 206, 209 (1952).

---

[5]The main difference between an equal protection and a substantive due process argument attacking legislation is that the equal protection argument requires that the legislation create classes of persons, while the due process claim may be brought where no classifications are involved or the classification is a class of one.  *See* L.R. McInnis, *The Municipal Management of Emergencies: The Houston Plan*, 4 Tex. F. on C.L. & C.R. 139, 152 (1999).

2. *Positions of the parties.* The plaintiffs assert that there is no reasonable fit between Cedar Rapids' purpose for establishing its ATE system—public safety—and the means chose to advance it. Plaintiffs rely heavily on the IDOT evaluation, which ordered the City to remove two of the camera installations and move the cameras in two other locations. According to plaintiffs, the IDOT evaluation ordering cameras be removed from two locations shows that these cameras do not promote public safety. Plaintiffs further claim that crash data demonstrate there is no benefit to the cameras on I-380. Further, plaintiffs claim the fact that citations are increasing, rather than decreasing, demonstrates that the system is not advancing Cedar Rapids' safety goals. Plaintiffs suggest the lack of support for the safety rationale demonstrates that the real goal of the City's ATE program is raising revenue.

In support of their attack on the relationship between the ATE system and public safety, plaintiffs cite an affidavit filed by their expert, Joseph Schofer. Schofer generally stated that before Cedar Rapids placed its ATE system at various locations, it should have conducted comprehensive vehicular speed and crash data analysis to determine proper placement. Without such data, it is not possible to know, according to Schofer, whether a particular location is dangerous enough to merit the placement of ATE equipment. Based on the facts known to him, Schofer stated the ATE locations in Cedar Rapids did not appear dangerous enough to warrant the use of ATE technologies. Given the relatively high number of violators, if those numbers are not decreasing, Schofer opined it would "seem that the principal achievement of the program is generating revenues . . . rather than one of enhancing the public safety goal of reducing traffic speed."

The plaintiffs also incorporate a lack-of-notice theory in their substantive due process attack. The plaintiffs claim the IDOT's order that cameras be moved in two locations based on their violation of a rule that cameras not be located within 1000 feet of a posted speed change shows that the placement of the equipment provided drivers with insufficient notice of the operation of the ATE system.

The plaintiffs launch a general arbitrariness attack on the ATE system. The plaintiffs assert that the ATE system is arbitrary and irrational because it burdens privately owned vehicles but not government-owned vehicles or semi-trailer trucks. Plaintiffs further suggest that the radar equipment is inadequately calibrated and has an admitted error rate of two percent, thereby producing arbitrary results.

Finally, the plaintiffs take great umbrage with the ATE system, declaring that it offends notions of fairness and human dignity. *See Blumenthal Inv. Trs. v. City of West Des Moines*, 636 N.W.2d 255, 265 (Iowa 2001). They claim that Cedar Rapids' continued violation of state law, in the form of the IDOT order, cannot be considered in good faith and is therefore a violation of substantive due process. This argument appears to be an expansive version of a shocks-the-conscience test.

Cedar Rapids responds that under the rational basis test of substantive due process, it is given considerable leeway. Cedar Rapids emphasizes there is no requirement that legislation employs the best means to achieve a legitimate state interest. *See Hensler v. City of Davenport*, 790 N.W.2d 569, 584 (Iowa 2010).

With respect to the IDOT order, Cedar Rapids notes the IDOT did not engage in an evidentiary proceeding and did not apply a substantive due process, rational basis test to the ATE system. Further, Cedar Rapids argues applying the substantive due process, rational basis test

is a task for a court, not a government agency. Cedar Rapids emphasizes that a number of courts considering the question have determined that ATE systems do not violate substantive due process. *See Idris*, 552 F.3d at 566; *Hughes*, 112 F. Supp. 3d at 840; *Smith v. City of St. Louis*, 409 S.W.3d 404, 425–26 (Mo. Ct. App. 2013).

Cedar Rapids recognizes that substantive due process prevents the government from "engaging in conduct that 'shocks the conscience,' or interferes with rights 'implicit in the concept of ordered liberty.' " *Zaber*, 789 N.W.2d at 640 (quoting *Atwood*, 725 N.W.2d at 647). The City notes that the ATE system simply enforces traffic laws with an opportunity to contest a citation using the administrative process, the courts, or both. The ATE system certainly does not shock the conscience. *See Hughes*, 112 F. Supp. 3d at 840 (Cedar Rapids ATE system "does not remotely approach the level of shocking the conscience").

3. *Discussion.* We begin our discussion first by considering the question of whether the plaintiff has met its burden of showing that the Cedar Rapids ATE system is not a reasonable fit to achieve its legitimate governmental purpose of public safety. An important part of plaintiffs' argument is the claim that the IDOT order sufficiently undermines Cedar Rapids' safety purpose so as to establish a substantive due process violation.

Our decision invalidating the IDOT rules substantially undermines the plaintiffs' claims. *See City of Des Moines*, 911 N.W.2d at 434. In any event, the IDOT rules related to ATE systems were highly restrictive. The rules did not establish a floor for determining whether an ATE system complies with a substantive due process, rational basis test. Instead, the IDOT rules were part of a quasi-legislative rulemaking process wherein a government agency considered the degree to which highly controversial

ATE systems should be permitted. Even if valid, the IDOT rules would not supplant the role of the court in determining whether there is a violation of substantive due process.

In any event, the IDOT order did not establish that the Cedar Rapids ATE system is so arbitrary or unrelated to public safety as to amount to a violation of substantive due process. With respect to two locations, the IDOT order required a movement of the camera/radar equipment to comply with an IDOT rule that such equipment not be placed within 1000 feet of a posted change in speed. Even if the IDOT report might be cited as establishing a violation of an IDOT rule, a violation of state law alone does not give rise to a substantive due process violation. *See Nordlinger v. Hahn,* 505 U.S. 1, 26, 112 S. Ct. 2326, 2340 (1992) (Thomas, J., concurring in part and dissenting in part); *Hughes,* 840 F.3d at 991; *McIntosh v. Patridge,* 540 F.3d 315, 323–24 (5th Cir. 2008); *Stern v. Tarrant Cty. Hosp. Dist.,* 778 F.2d 1052, 1059 (5th Cir. 1985).

The IDOT's order that the City remove or disable ATE equipment at two locations also does not establish a substantive due process violation. The IDOT order does not suggest that these locations have no relationship to public safety. Rather, the IDOT order indicates that the ATE equipment at these locations is "beyond the area of primary concern," namely, the area immediately preceding the "S" curve on I-380 in downtown Cedar Rapids. According to the IDOT, ATE systems should only be considered "in extremely limited situations" on interstate roads because they are "the safest class of any roadway in the state and typically carry a significant amount of non-familiar motorists." The IDOT order does not make a finding that the equipment did not promote public

safety, but only that the placement of the ATE equipment did not meet the narrow criteria developed for placement of ATE equipment.

It is, of course, true that the ATE system generates revenues for Cedar Rapids. That fact alone does not invalidate the ordinance on substantive due process grounds in this case. Just as a tax on tobacco has the potential of deterring youth smoking, Cedar Rapids may rationally believe that the impositions of fines for speeding violations generally deters speeding. *See Gardner*, 656 F. Supp. 2d at 761 (stating while ATE ordinance "no doubt raise revenue," it also "serves to promote safe driving practices"); *cf.* Randolph Kline et al., *Beyond Advertising Controls: Influencing Junk-Food Marketing and Consumption with Policy Innovations Developed in Tobacco Control*, 39 Loy. L.A. L. Rev. 603, 622 & n.93 (2006) ("[T]axes help deter smoking by raising the cost of tobacco, which has been shown to be the most effective approach to lowering smoking rates, especially among youth, who are generally sensitive to price increases."). The fact that speeding violations at locations may not have declined over certain time periods does not establish a lack of relationship to public safety, but may be due to increased traffic or other factors. Further, Cedar Rapids may rationally conclude that the incidence of speeding would have been even larger in the absence of ATE enforcement.

The plaintiffs raise a series of technical arguments regarding the accuracy and reliability of the ATE system. While they might conceivably provide the basis for a defense in a particular case, they do not provide the basis for a facial challenge to the ATE system on substantive due process grounds. For instance, while plaintiffs assert an error rate of two percent, that is actually pretty good and, in any event, a driver has an

opportunity to challenge the accuracy of any citation through the administrative and/or judicial process established by the ATE ordinance.

Yet, we are troubled by other facts in this record. Cedar Rapids reaps large amounts of money from the ATE system—millions of dollars per year. If promoting safety were Cedar Rapids' real goal, why does the ordinance penalize vehicle owners and not the drivers where the deterrence function would be much greater? The idea that vehicle owners will be more careful allowing others to drive their vehicles seems tenuous at best. One might also wonder why the City maintains a system generating 35,000 tickets per year at the end of the hazardous "S" curve when, according to IDOT, most of the danger has passed. This suggests that the placement of the ATE equipment is concerned with the generation of money rather than safety. And, the notice of violation seems primarily designed to getting money quickly from cited owners by not candidly advising the owners of their right to a district court proceeding and by threatening them with the prospect of adverse impact on their credit rating.

Yet, on balance, we conclude that the record in this case shows as a matter of law that the issue is fairly debatable. Enforcing speed limits on busy roads is not inherently irrational. Making unlawful behavior costly is also not irrational, and there is a fair likelihood that the owner of the vehicle was either the driver or the driver was a family member of the owner. It may be that Cedar Rapids and Gatso did not undertake preimplementation studies that the plaintiffs' expert would have preferred, but there is no requirement that the government act in an optimum manner in order to satisfy substantive due process. Further, while the continued high number of violations over time at some ATE locations is interesting, it does not make it irrational or arbitrary to

continue to maintain the systems at those locations. After all, without the ATE system to deter violations, the number of speeders might have been even higher. We are not engaged in strict scrutiny review; rather, we are engaged in a careful but deferential review, even if applied with greater bite than federal precedent.

We next consider whether the ATE ordinance runs afoul of substantive due process under a shocks-the-conscience test. Under federal precedent following *Rochin*, 342 U.S. 165, 72 S. Ct. 205, the shocks-the-conscience test has become extremely difficult to meet. As noted in *United States v. Duvall*, the shocks-the-conscience test is reserved for "the rarest and most outrageous circumstances." 846 F.2d 966, 973 (5th Cir. 1988) (quoting *United States v. Arteaga*, 807 F.2d 424, 426 (5th Cir. 1986)). We observed in *Blumenthal* that in order to meet the test, government action must be, among other things, "offensive to human dignity." 636 N.W.2d at 265 (quoting *Rivkin v. Dover Twp. Rent Leveling Bd.*, 671 A.2d 567, 575 (N.J. 1996)). Further, we observed that "the collective conscience of the United States Supreme Court is not easily shocked." *Id.* (quoting *Rivkin*, 671 A.2d at 575).

Some states have departed from the narrow federal shocks-the-conscience precedent in some contexts. For instance, several state supreme courts have found that certain types of police misconduct in the context of entrapment might shock the conscience even if the defendant was predisposed to commit crime and therefore not entitled to an entrapment defense. *See State v. Glosson*, 462 So. 2d 1082, 1085 (Fla. 1985) (involving use of contingent fee for informant testimony); *State v. Hohensee*, 650 S.W.2d 268, 268–69, 274 (Mo. Ct. App. 1982) (reversing conviction based on burglary sponsored and operated by police as violating due process); *People v. Isaacson,* 378 N.E.2d 78, 84–85 (N.Y.

1978) (holding conviction based on police misconduct and trickery to secure drug sales violates due process).

Yet, even if we were to adopt a somewhat less restrictive approach to the shocks-the-conscience test, we would not apply the doctrine under the facts presented here. There is no doubt that many citizens regard ATE systems as "speed traps." ATE systems are unforgiving and nondiscriminatory. The ATE systems deprive citizens of the opportunity to plead their case to a local police officer who pulls them to the side of the road, in the hope of obtaining a warning instead of a citation through the exercise of the officer's discretion. Further, ATE systems dramatically increase the chances of receiving a citation for a speeding violation compared to the traditional enforcement technique of chase and capture. To persons with a penchant to speed, the increased efficiency of detection is undesirable. Finally, many see ATE systems with their combination of cameras and radar as Orwellian invasions of privacy. The Cedar Rapids ATE system, with its various notices, seeks to encourage payment of fines rather than to force the City to bring a municipal infraction in small claims court.

While we respectfully acknowledge these concerns, this case involves traffic citations with small fines, not the pumping of a resisting person's stomach. *See Rochin*, 342 U.S. at 166, 72 S. Ct. at 206. There is no outrageous utilization of physical force; state-sponsored imposition of uncalled-for embarrassment or ridicule; or intolerable, disreputable, and underhanded tactics that may arise from government action deliberately designed to penetrate attorney–client privilege. Cedar Rapids publicly enacted the ATE ordinance, and the ATE system is no secret. The City announces the presence of the cameras on the road. The invasion of privacy associated with a system based upon rear license

plate photographs is minimal. Based on the record in this case, the ATE system does not shock the conscience for purposes of substantive due process under the due process clause of article I, section 9 of the Iowa Constitution.

It is important to emphasize again that under substantive due process analysis, the state is given great leeway in achieving its legitimate goals, particularly those related to public safety. *Mackey v. Montrym*, 443 U.S. 1, 17–19, 99 S. Ct. 2612, 2620–21 (1979). The question before us is not whether Cedar Rapids has made an optimum policy choice, or whether it could have made a better policy choice, but whether it has made a permissible policy choice in implementing the ATE system based on the factual record before us.

That said, the mere incantation of the abracadabra of public safety does not end the analysis. It is possible to imagine a scenario in which the challenger develops a factual record that demonstrates an ATE system as implemented is so attenuated and remote from public safety concerns and is simply designed to raise revenues for the city that it violates rationale basis analysis.[6] But we conclude that the plaintiffs have not made such a showing in this case.

**D. Equal Protection, Privileges and Immunities Claims.**

1. *Introduction.* We now consider the plaintiffs' equal protection and privileges and immunities claims under article I, section 6 of the Iowa Constitution. Here, the focus is not on the rationality of the ATE system in general, as was the case with the substantive due process

---

[6]The plaintiffs have not claimed that the ATE system is an illegal tax not authorized by the legislature. *See Brennan*, 470 S.W.3d at 384 (Draper, J., concurring); *Ballard*, 419 S.W.3d at 122; *cf. Homebuilders Ass'n of Greater Des Moines v. City of West Des Moines*, 644 N.W.2d 339, 350 (Iowa 2002) (holding park fees were taxes rather than regulatory fees). We express no view on this issue.

argument, but is instead on the rationality of classifications utilized by the ATE system.

We note the ATE ordinance itself does not establish, on its face, some of the classifications that the plaintiffs challenge. For instance, the ATE ordinance does not distinguish between privately owned vehicles, semi-trailer trucks, and government-owned vehicles. These distinctions arise only in the context of the ordinance's implementation through the use of a system and a database that does not permit enforcement of the ATE system against semi-trailer truck owners or government-owned vehicles.

Nonetheless, we think equal protection principles are applicable to the classifications that arise as a result of the manner of implementation of the ATE ordinance. When a statute is facially neutral and does not contain a classification, the plaintiff must prove a classification is used in practice. If the plaintiff meets that burden, the court proceeds with an equal protection analysis. *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 818–19 (4th Cir. 1995); *cf. Hy-Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n*, 453 N.W.2d 512, 516 (Iowa 1990) (distinguishing between disparate treatment and disparate impact in employment discrimination case and noting that "[t]he latter involves employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity").

2. *Positions of the parties.* Plaintiffs assert that as implemented, the ordinance gives rise to three separate classifications that offend Iowa concepts of equal protection. First, plaintiffs note that unlike ordinary vehicle owners who are exposed to Cedar Rapids' ATE system, semi-trailer truck owners, whose rear license plates are not included in the

database used by the ATE system to identify vehicle owners, are not, as a practical matter, subject to enforcement under the ordinance. Plaintiffs make a similar as-applied equal protection argument with respect to government-owned vehicles, whose plate numbers also are not found in the database used by the ATE system. Finally, the plaintiffs cite the fact that out-of-state vehicle owners may submit written appeals, while the same procedure is not extended to in-state vehicle owners, as evidence the ordinance, as applied, violates equal protection.

Plaintiffs identify safety as the ATE ordinance's ostensible purpose, which provides the context for evaluating the classification. *See Gartner v. Iowa Dep't of Pub. Health*, 830 N.W.2d 335, 350–51 (Iowa 2013). Plaintiffs proceed to argue that the asserted state interest of safety must be "realistically conceivable" and must have "a basis in fact." *See RACI II*, 675 N.W.2d at 7–8 (emphasis omitted) (first quoting *Miller*, 394 N.W.2d at 779). According to the plaintiffs, the classifications in the ordinance must be evaluated to determine whether the classifications bear any relationship to the purpose of the ordinance, namely, promoting public safety. Plaintiffs suggest that Cedar Rapids is not entitled to deference in the evaluation of the classifications because the decision to create the classifications was not made by the Cedar Rapids City Council, but by Cedar Rapids employees and Gatso in implementing the ordinance.

Plaintiffs argue that from a safety viewpoint, it is irrational to exclude semi-trailer trucks and government-owned vehicles from the ATE system. Plaintiffs claim that semi-trailer trucks and government-owned vehicles do not pose any less of a safety risk on interstate highways than vehicles identified in the database used by the City. In the vernacular of our caselaw, plaintiffs assert that the relationship between the classification and safety is "so attenuated as to render the distinction

arbitrary or irrational." *RACI II*, 675 N.W.2d at 8 (quoting *Fitzgerald*, 539 U.S. at 107, 123 S. Ct. at 2159). According to plaintiffs, distinguishing ordinary vehicles from semi-trailer trucks and government-owned vehicles is as irrational as distinguishing between racetracks and riverboats in *RACI II*.

The plaintiffs also challenge the fact that out-of-state vehicle owners are allowed to submit written appeals while the same privilege is not extended to vehicle owners who are Iowa residents. The plaintiffs point out that some in-state residents live further from Cedar Rapids than do some out-of-state residents.

Cedar Rapids responds by citing federal precedent for the proposition that we have generally followed federal equal protection analysis when construing article I, section 6. *See Johnson v. Univ. of Iowa*, 408 F. Supp. 2d 728, 749 (S.D. Iowa 2004) (citing the pre-*RACI II* case of *In re Det. of Morrow*, 616 N.W.2d 544 (Iowa 2000)), *aff'd*, 431 F.3d 325 (8th Cir. 2005). Applying the traditional caselaw, Cedar Rapids asserts that plaintiffs' arguments fail.

Cedar Rapids recognizes that an equal protection challenge may be launched based upon classifications established by the practical application of a statute or ordinance. Nonetheless, classifications created by practical applications still must generally be reviewed by a court through application of the rational basis test. In the application of the rational basis test, the City argues we should accept "generalized reasons to support the legislation, even if the fit between the means and end is far from perfect." *Varnum*, 763 N.W.2d at 879 n.7. A classification or practice is not invalid, Cedar Rapids urges, "because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' " *U.S. R.R. Ret. Bd. v. Fritz*, 449

U.S. 166, 175, 101 S. Ct. 453, 459 (1980) (quoting *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S. Ct. 1153, 1161 (1970)). Cedar Rapids asserts that the legislature "may select one phase of one field and apply a remedy there, neglecting the others." *Hawkeye Commodity Promotions, Inc. v. Miller*, 432 F. Supp. 2d 822, 859 (N.D. Iowa 2006) (quoting *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489, 75 S. Ct. 461, 465 (1955)).

Under the above principles, Cedar Rapids argues, the fact that the ATE system does not capture every vehicle does not make it legally infirm. Quoting the federal district court decision in *Hughes*, Cedar Rapids argues that it is rational to conclude a system that "only photographs rear license plates is less expensive and that it is more cost-effective to capture fewer people who violate the Ordinance with a less expensive system." *Hughes*, 112 F. Supp. 3d at 842. The use of the Nlets database may be the most cost-effective way to enforce the ordinance. *See id.* at 842–43. Further, Cedar Rapids asserts that a front license plate system would be more invasive of privacy as passengers in the vehicle may be identifiable, as well as more costly, technically more difficult, largely redundant, and burdensome.

With respect to the classification in the ordinance allowing out-of-state recipients to respond by mail rather than appearing in person, Cedar Rapids argues such a classification is rational. The classification, according to Cedar Rapids, might not use mathematical niceties, but it is rational to assume, generally, that the burden of responding to a citation in person is greater on out-of-state vehicle owners than it is on in-state vehicle owners.

3. *Discussion.* We first consider the question of whether the exclusion of government-owned vehicles and semi-trailer trucks from the

Nlets database and the resulting inability of the Cedar Rapids ATE system to cite these vehicles for speeding violate equal protection under the Iowa Constitution. *See RACI II*, 675 N.W.2d at 10. Certainly, from a pure safety viewpoint, there is no reason to think that government-owned vehicles and semi-trailer trucks are less dangerous than privately owned vehicles generally, and Cedar Rapids has not made such a claim.

Cedar Rapids, however, argues that use of the Nlets system is cost-effective. While other systems might be available, they would be more expensive, according to Cedar Rapids. The summary judgment record, however, contains no direct evidence regarding the cost of implementing a front camera system that captured the license plates of vehicles hauling semi-trailers. It might be inferred, perhaps, that the cost of radar and camera technology capturing front plates should be no different from the cost of capturing back plates. All that changes is the direction of the equipment. But the record does not contain any actual dollar figures comparing the costs of the two systems.

At the outset, we think that a government may rationally decide to confront part of a problem rather than the whole problem for reasons of cost. Providing law enforcement in a cost-effective manner is a legitimate government interest. *Cf. Thomas v. Fellows*, 456 N.W.2d 170, 173 (Iowa 1990) (holding statute requiring disclosure of expert witness in medical malpractice case did not violate plaintiffs' equal protection rights on ground that it abridged access to the courts, noting "the problems surrounding medical liability, liability insurance, and the attendant availability *and cost of medical services to the pubic* are . . . rational reasons for the enactment"); *State v. Nat'l Advert. Co.*, 387 A.2d 745, 750 (Me. 1978) (holding classification scheme adopted by state to keep the cost of its control of highway advertising to a minimum did not violate

equal protection under a rational basis analysis "because all sign owners affected by the legislation were not treated alike"); *Menefee v. Queen City Metro*, 550 N.E.2d 181, 183 (Ohio 1990) (holding statute that prohibited subrogation claims against political subdivisions by insurers was rationally related to state's interest in preserving financial soundness of subdivision and not violative of equal protection). *But see Graham v. Richardson*, 403 U.S. 365, 374–75, 91 S. Ct. 1848, 1853 (1971) (holding that while state may legitimately attempt to limit its spending, it cannot do so by invidious distinction between "persons" for equal protection purposes); *Bruns v. Mayhew*, 750 F.3d 61, 66 (1st Cir. 2014) ("Though states traditionally enjoy broad power to regulate economics and social welfare, even the otherwise 'valid interest in preserving the fiscal integrity of [state] programs' is generally insufficient grounds for a state-imposed burden on alienage to survive an equal protection challenge." (quoting *Graham*, 403 U.S. at 374, 91 S. Ct. at 1853)). Law enforcement makes decisions to limit law enforcement all the time based upon resource limitations. The fact that a local government has police resources for road radar at two out of ten locations with comparable speeding problems and safety concerns does not mean there is an equal protection problem because not all similar locations in the city have been covered.

The question is whether Cedar Rapids has shown, as a matter of law on the summary judgment record, that no reasonable fact finder could conclude that the City's purported cost justification was not "realistically conceivable" and had no "basis in fact." *RACI II*, 675 N.W.2d at 7–8 (emphasis omitted) (first quoting *Miller*, 394 N.W.2d at 779); *see also Residential & Agric. Advisory Comm., LLC v. Dyersville City Council*, 888 N.W.2d 24, 50 (Iowa 2016) (emphasizing that the legitimate government interest must have a basis in fact).

While the record does not concretely establish the cost of front- and back-plate systems, it does establish that Cedar Rapids generates millions of dollars from the back-plate ATE system that prevents inclusion of semi-trailer trucks. If the City employed front- and back-plate license technology, one can fairly infer that fines paid by speeding semi-trailer truck owners would increase revenues by some amount. Is it realistically conceivable that the cost of front- and back-plate cameras would exceed the revenues generated by the additional fines paid by semi-trailer truck owners?

If the evidence in this case demonstrated that the cost difference between front- and back-plate and back-plate technology were minimal—or even nonexistent—Cedar Rapids' asserted cost justification might be questioned. Facts matter. But is there enough, *on the present record*, to allow a fact finder to conclude that the issue is fairly debatable?

This court is not comprised of experts on ATE systems. While the front- and back-plate technology might be available, the record does not give us any idea what the problems might be in implementing such a system. Is it more difficult or more costly to implement a front- and back-plate system that captures semi-trailer trucks? Is there something about the size and configuration of semi-trailer trucks that requires more costly systems? Do the same systems that capture speeding semi-trailer trucks capture ordinary speeding passenger vehicles? The record does not tell us in any concrete way what the costs of implementing a front-plate system would be or what additional revenues would be generated by the inclusion of semi-trailer trucks in the ATE system. The bottom line is that, on the present record, we conclude the City's asserted cost rationale is realistically conceivable and has a basis in fact.

With respect to the noninclusion of government-owned vehicles, we also reject the plaintiffs' equal protection claim. Cedar Rapids notes that government-owned vehicles are not part of the Nlets database. The record in this case, however, does not establish whether there are other databases that include government-owned vehicles that Cedar Rapids can access in a cost-effective manner. Here, there are no inferences from facts in the record that would show that the cost would be insignificant compared to the revenue generated, and there is no evidence that the cost rational is not realistically conceivable and supported "in fact." On the summary judgment record, Cedar Rapids' position on the exclusion of government-owned vehicles is plausible and fairly debatable as a matter of law. The district court properly granted summary judgment on this claim.

We now turn to whether allowing out-of-state vehicle owners to participate in administrative hearings through written submission while not extending the same opportunity to in-state vehicle owners violates equal protection. We think it does not. It is rational to allow vehicle owners that live at great distances from Cedar Rapids to respond by mail rather than requiring them to appear at a hearing to contest a citation. *See RACI II*, 675 N.W.2d at 7. A more exact method might be to allow written submissions by persons who live a certain number of miles outside Cedar Rapids, but this could pose substantial administrative problems determining who lives within the mileage radius. The use of state residency provides a less complex approach than a mileage approach. *See State v. Mitchell*, 757 N.W.2d 431, 436 (Iowa 2008) (noting that under rational basis review, a classification need not be narrowly tailored). It is rational to assume that vehicle owners who live out of state, in general, live further from Cedar Rapids than Iowa residents.

**V. Procedural Challenges Based on Preemption and Procedural Due Process.**

**A. Challenges Based Upon Preemption.**

1. *Introduction.* Municipalities have home rule authority to enact legislation "not inconsistent with the laws of the general assembly." Iowa Const. art. III, § 38A. This means that the general assembly has the power to preempt municipalities from enacting otherwise lawful legislation.

There are two types of preemption. *Madden v. City of Iowa City*, 848 N.W.2d 40, 49 (Iowa 2014). The legislature may expressly preempt certain kinds of local legislation. *Id.* In addition to express preemption, we have recognized under certain circumstances that the legislature may impliedly preempt local legislation. *Id.* Implied preemption occurs when "an ordinance prohibits an act permitted by statute, or permits an act prohibited by statute." *Seymour*, 755 N.W.2d at 538.

The standard for concluding that a local ordinance is impliedly preempted is demanding. *Id.* at 539. In order to conclude that an ordinance is impliedly preempted, "local law must be 'irreconcilable' with state law." *Id.*

We have already considered whether municipal ATE systems that impose civil penalties for violation of statewide traffic regulations were impliedly preempted. *Id.* at 537. We held that the municipal ATE systems were not impliedly preempted because they were not irreconcilable with state law. *Id.* at 542–43; *cf. Hensler*, 790 N.W.2d at 585–86 (holding city's parental responsibility ordinance was not impliedly preempted by Iowa's comprehensive juvenile justice code).

In *Rhoden v. City of Davenport*, we considered whether the Davenport ATE ordinance was inconsistent with Iowa Code section

364.22(7). 757 N.W.2d 239, 241 (Iowa 2008). The court noted that section provides in relevant part, "All penalties or forfeitures collected *by the court* for municipal infractions shall be remitted to the city in the same manner as fines and forfeitures are remitted for criminal violations under section 602.8106." *Id.* (emphasis in original) (quoting Iowa Code § 364.22(6) (2008) (now § 364.22(7) (2018))). In *Rhoden*, we found that the procedure for remitting fines in the Davenport ATE ordinance was not inconsistent with the statute where there was no court involvement in the process. *Id.* We noted that Iowa Code section 364.22(6) applied only to forfeitures "collected by the court." *Id.* (emphasis omitted). Under the Davenport ordinance, only "payments for unchallenged violations" which did not involve the court were payable to Davenport's finance department rather than to the clerk of the district court as required when judicial means are employed to collect fines. *Id.* We held that the ordinance providing for payments to Davenport's finance department was not inconsistent with the procedures required by Iowa Code section 364.22(6) when fines were "collected by the court." *Id.*

In this case, plaintiffs challenge the ordinance because it allows the City to enforce civil penalties outside the judicial process for enforcing "municipal infractions" provided in Iowa Code section 364.22 and the jurisdictional provisions of Iowa Code section 602.6101.

2. *Relevant statutes, ordinances, and notices.* Before considering further plaintiffs' implied preemption claim, we set out the relevant statutes and provisions of the ATE ordinance.

Iowa Code section 602.6101 relates to the jurisdiction of the district court, which is generally exclusive, subject to certain exceptions. This provision states, in relevant part,

> The district court has exclusive, general, and original jurisdiction of all actions, proceedings, and remedies, civil, criminal, probate, and juvenile, except in cases where exclusive or concurrent jurisdiction is conferred upon some other court, tribunal, or administrative body.

Iowa Code § 602.6101 (2015).

Iowa Code chapter 364 deals with the powers and duties of cities. Section 364.22 provides a detailed framework for dealing with municipal infractions. Section 364.22(1)(*a*) provides that "[a] municipal infraction is a civil offense punishable by a civil penalty of not more than seven hundred fifty dollars for each violation" unless the infraction is a repeat offense. For repeat offenses, the penalty may not exceed one thousand dollars. *Id.*

Under section 364.22(2), a city "may provide that a violation of an ordinance is a municipal infraction." Section 364.22(4) states an authorized officer of the city "may issue a civil citation to a person who commits a municipal infraction." A civil citation for a municipal infraction must include, among other things, "[t]he time and place of court appearance" and "[t]he penalty for failure to appear in court." *Id.* § 364.22(4)(*f*), (*g*). Iowa Code section 364.22(4) further provides that service of the civil citation may be made

> by personal service as provided in rule of civil procedure 1.305, by certified mail addressed to the defendant at the defendant's last known mailing address, return receipt requested, or by publication in the manner provided by the rule[s] of civil procedure.

*Id.* § 364.22(4).

Iowa Code section 364.22(6)(*a*) provides that in municipal infraction proceedings "[t]he matter shall be tried before a magistrate, a district associate judge, or a district judge in the same manner as a small claim." At a trial on a municipal infraction, "[t]he city has the burden of

proof that a municipal infraction occurred and that the defendant committed the infraction." *Id.* § 364.22(6)(*b*). The city's burden of proof is "by clear, satisfactory, and convincing evidence." *Id.* A defendant in a municipal infraction proceeding is entitled to "be represented by counsel of the defendant's own selection and at the defendant's own expense." *Id.* § 364.22(6)(*d*). Only when a judgment has been entered against the defendant may the court "[i]mpose a civil penalty by entry of a personal judgment against the defendant." *Id.* § 364.22(10)(*a*)(1). The court may also "[d]irect that payment of the civil penalty be suspended or deferred under conditions imposed by the court" or "[g]rant appropriate alternative relief ordering the defendant to abate or cease the violation." *Id.* § 364.22(10)(*a*)(2), (3).

The City's ATE ordinance does not directly characterize a notice of violation arising from the ATE system as a "municipal infraction," but simply declares that a vehicle owner is liable for "[c]ertain [t]raffic [o]ffenses" as provided in the ordinance. Cedar Rapids, Iowa, Mun. Code § 61.138(c). For such "traffic offenses," including those based on speed, the ordinance establishes a schedule of "civil fines" ranging from $25 to $750 per violation. *Id.* § 61.138(d)(3). The maximum "civil fine" is the same as the maximum "civil penalty" authorized by Iowa Code section 364.22(1)(*a*) for municipal infractions. Further, the ordinance specifically states that the fines imposed are "subject in any event to the limit on fines sought in municipal infractions." *Id.* § 61.138(d)(3).

The process for imposing liability under the ordinance is different from that under Iowa Code section 364.22. Under the ordinance, the notice of violation is sent by first class mail to the vehicle owner for each recorded violation, not served personally, sent by certified mail, or served by publication as under Iowa Code section 364.22(4). *Id.* § 61.138(d)(1).

Like Iowa Code section 364.22, the ordinance provides a laundry list of what must be included in the notice. *Compare* Iowa Code § 364.22(4), *with* Cedar Rapids, Iowa, Mun. Code § 61.138(d)(1). The laundry list under the ordinance, however, does not include the right to be represented by counsel or the right to notice about *court* appearances and penalties imposed by the *court* as in Iowa Code section 364.22.

The ATE ordinance provides procedures for contesting a citation in two lengthy paragraphs that are at variance with Iowa Code section 364.22. *See* Cedar Rapids, Iowa, Mun. Code § 61.138(e). According to the ordinance, a vehicle owner who has received a notice of violation may contest it in two ways. *Id.* The first path is by seeking a hearing before an administrative appeals board, a process not provided in Iowa Code section 364.22. *Compare* Iowa Code § 364.22, *with* Cedar Rapids, Iowa, Mun. Code § 61.138(e)(1). Specifically, the ordinance provides that a vehicle owner may contest a citation

> [b]y submitting in a form specified by the City a request for an administrative hearing to be held at the Cedar Rapids Police Department before an administrative appeals board (the "Board") consisting of one or more impartial fact finders. Such a request must be filed within 30 days from the date on which Notice of the violation is sent to the Vehicle Owner. After a hearing, the Board may either uphold or dismiss the Automated Traffic Citation, and shall mail its written decision within 10 days after the hearing to the address provided on the request for hearing. If the citation is upheld, then the Board shall include in its written decision a date by which the fine must be paid, and on or before that date, the Vehicle Owner shall either pay the fine or submit a request pursuant to the next paragraph . . . .

Cedar Rapids, Iowa, Mun. Code § 61.138(e)(1).

The second path for contesting an ATE citation is through submitting a request that Cedar Rapids issue a municipal infraction citation and proceed with enforcement of the municipal infraction in

small claims court. *Id.* § 61.138(e)(2). Specifically, the ordinance provides that a vehicle owner may challenge an ATE citation

> [b]y submitting in a form specified by the City a request that in lieu of the Automated Traffic Citation, a municipal infraction citation be issued and filed with the Small Claims Division of the Iowa District Court in Linn County. Such a request must be filed within 30 days from the date on which Notice of the violation is sent to the Vehicle Owner.

*Id.* § 61.138(e)(2).

Finally, the ordinance has a provision related to the failure of a vehicle owner to timely pay or appeal. *Id.* § 61.138(g). Under section 61.138(g), if a recipient of a traffic citation does not "pay the fine by the due date stated on the original citation or contest the citation" through either seeking an administrative hearing or requesting the filing of a municipal infraction, "then the recipient shall be deemed to have waived all rights to contest the citation" and "shall be liable for any fine imposed herein plus a late penalty of 25% of the fine imposed for failure to timely pay or appeal the citation." *Id.*

In other words, under the ordinance, a recipient who does nothing upon receipt of a citation is declared "liable" and the sums due "shall constitute a debt due and owing to the City of Cedar Rapids." *Id.* Similarly, a vehicle owner is "deemed" to have waived all rights to contest the citation if the owner pursues the administrative remedy provided by the ordinance but does not timely request that the City file a municipal infraction after an adverse result at the administrative hearing. *Id.*

Thus, unlike Iowa Code section 364.22, a vehicle owner who does nothing is declared liable under the ordinance. Under Iowa Code section 364.22, no liability arises until the city takes the affirmative step of filing an enforcement action in district court and obtains a judgment against the defendant. *See* Iowa Code § 364.22(4), (5)(*b*), (6)(*f*), (10)(*a*) (imposing

a duty on the city to file the citation with the district court and the county treasurer's office).  Iowa Code section 364.22 does provide for entry of judgment upon default of the defendant, but only if the court determines that defendant has been served pursuant to Iowa Code section 364.22(4) and the defendant's failure to respond was without good cause.  *Id.* § 364.22(7).

3. *Positions of the parties.*  The plaintiffs make three separate arguments asserting that state law preempts the ATE system.

First, the plaintiffs facially attack the ordinance as conflicting with several provisions of state law.  The plaintiffs point out that under Iowa Code section 364.22(6)(*a*), municipal infractions must be tried before a magistrate, a district associate judge, or a district court judge "in the same manner as a small claim."  The plaintiffs argue that the ATE ordinance, which provides the right to contest the violation at an administrative hearing, is inconsistent with the legislative mandate that municipal infractions must be tried as a small claim.  Further, plaintiffs argue the administrative hearing process established in the ATE ordinance is inconsistent with the legislature's directive that district courts have "exclusive, general, and original jurisdiction of all actions." *Id.* § 602.6101.  The plaintiffs argue that these statutes demonstrate that the ATE ordinance permits what the legislature has prohibited.

Plaintiffs attack the administrative process established by the ordinance.  Plaintiffs note that Iowa Code section 364.22(6)(*b*) requires Cedar Rapids bear the burden of proving a municipal infraction by "clear, satisfactory, and convincing evidence."  Yet, the administrative hearing officers in this case appear to have rendered decisions on the issues based upon a preponderance of the evidence.

As part of their challenge to the administrative process established by the ordinance, the plaintiffs point to three provisions of Iowa Code section 364.22(4) related to municipal infractions. First, plaintiffs note that this provision provides that "[a]n officer authorized by a city" may issue a municipal infraction citation. *Id.* Further, the section states that service of the municipal infraction may be made by personal service, certified mail with return receipt requested, or by publication. *Id.* Finally, the section requires that a copy of the citation "shall be retained" by the issuing officer and the original citation sent to the clerk of court. *Id.* The plaintiffs point out that the ATE ordinance allows Gatso, a private entity, to issue the citation; that service is allowed by ordinary mail; and that a copy of the citation is not filed with the district court.

Additionally, plaintiffs argue the IDOT evaluation and order preempted the citations issued after March 2015 in this case. According to the plaintiffs, Cedar Rapids' continued use of the radar and cameras after the issuance of the order is patently inconsistent and irreconcilable with the agency's decision. As a result, the plaintiffs argue that Cedar Rapids' conduct is preempted.

Finally, the plaintiffs argue the ATE system's failure to capture government-owned vehicles creates a preemption problem. Iowa Code section 321.230 expressly states that the provisions of the chapter on traffic laws, including speeding regulations, apply to the drivers of all government vehicles. Thus, Plaintiffs claim the operation of the ATE system, which does not capture government-owned vehicles, is preempted.

Cedar Rapids responds by emphasizing that in order for preemption to apply, the conflict between the statute and the local ordinance must be *irreconcilable. See Seymour*, 755 N.W.2d at 539.

Cedar Rapids stresses that the ordinance's administrative hearing procedure is not irreconcilable with the cited statutory provisions because the ATE ordinance allows the recipient to contest the violations in small claims court either instead of or in addition to the administrative hearing. The essence of Cedar Rapids' argument is that there is nothing wrong with adding an additional layer of process as long as a vehicle owner retains the right to compel Cedar Rapids to file a municipal infraction citation in district court.

At most, according to Cedar Rapids, the administrative board established by the ATE ordinance has concurrent jurisdiction with the district court. Cedar Rapids points out that Iowa Code section 602.6101 expressly provides an exception to the exclusive jurisdiction of district courts when another tribunal has concurrent jurisdiction.

Cedar Rapids further denies that a city officer does not issue the ATE citations. Cedar Rapids points out that an officer approves each citation before it is issued and the officer's electronic signature is attached to the bottom of each citation.

4. *Discussion.* We first consider whether the ordinance, on its face, is preempted by various provisions of the Iowa Code related to municipal infractions and district court jurisdiction. In determining whether the ordinance is preempted, we must determine whether the ordinance is "irreconcilable" with the terms of the statutes cited by the plaintiffs. *See id.*

The first question is whether the terms of the ordinance create a "municipal infraction" under Iowa Code section 364.22. The statute defines "municipal infraction" as "[a] civil offense punishable by a civil penalty of not more than seven hundred fifty dollars for each violation" unless the infraction is for a repeat offense. Iowa Code § 364.22(1)(*a*).

Consistent with the definition of "municipal infraction" in the statute, the ordinance establishes a "civil fine" up to $750 per violation. Cedar Rapids, Iowa, Mun. Code § 61.138(d)(3). Further, the ordinance itself recognizes that the amount of "civil fine" under the ordinance is "subject . . . to the limit on fines sought in municipal infractions." *Id.*

We thus think it clear that an ordinance violation where a civil fine is sought is a "municipal infraction" under the statute. A city cannot avoid Iowa Code section 364.22 by simply declaring that an effort to impose a civil penalty for an ordinance violation is not really a municipal infraction. *Cf. City of Vinton v. Engledow,* 258 Iowa 861, 866, 140 N.W.2d 857, 861 (1966) (invalidating a municipal ordinance that attempted to redefine "reckless driving," a term already defined by state statute).

Having concluded that a violation of the ordinance resulting in a "civil fine" is a "municipal infraction" under Iowa Code section 364.22(1)(*a*), the next question is whether the ordinance complies with the requirements imposed by the statute.

Iowa Code section 364.22 provides procedural and substantive protections for those charged with municipal infractions. In order to commence a municipal infraction proceeding, an officer of the city may issue a citation to the defendant. Iowa Code § 364.22(4). The citation, which "serve[s] as notification that a civil offense has been committed," is required to contain certain information, including "[t]he time and place of *court* appearance," and "[t]he penalty for failure to appear in *court.* *Id.* § 364.22(4)(*f*)–(*g*) (emphasis added).

The statute directs such enforcement actions be tried in the district court "in the same manner as a small claim." *Id.* § 364.22(6)(*a*). This statutory provision assures a defendant of the right to present

evidence and to contest violations before a neutral magistrate. *Id.* § 364.22(6)(*c*). In order to assure that the defendant can effectively defend against alleged municipal infractions, the statute provides a right to representation by counsel at the defendant's expense in a proceeding involving a municipal infraction. *Id.* § 364.22(6)(*d*).

In a municipal infraction proceeding, the city bears the burden of proof "by clear, satisfactory, and convincing evidence." *Id.* § 364.22(6)(*b*). *After a judgment is entered against the defendant,* the court may "[i]mpose a civil money penalty by the entry of a personal judgment against the defendant." *Id.* § 364.22(10)(*a*)(1). The court is also authorized to suspend or defer payment or "[g]rant appropriate alternate relief ordering the defendant to abate or cease the violation." *Id.* § 364.22(10)(*a*)(2), (3).

These procedural and substantive rules are plainly designed to establish the ground rules that a city must follow in seeking to enforce an ordinance through the imposition of civil monetary penalties. They are a legislative response to the adage, "You cannot fight city hall."

We think it plain that the requirements of Iowa Code section 364.22 apply to any effort by a city to enforce a civil penalty arising from a municipal infraction when a defendant denies liability. When a city seeks to enforce a municipal ordinance through imposition of a civil penalty in the face of a protesting citizen, there can be no "shortcut around the judicial system and its protection for the rights of the accused." *Brennan,* 470 S.W.3d at 382; *see Belt,* 307 S.W.3d at 652–53. *But see Walker,* 39 N.E.3d at 474.

That said, we also think it clear that voluntary informal means of attempting to resolve disputes regarding municipal infractions prior to the filing of a municipal infraction proceeding is permitted. That is the

teaching of *Rhoden*, 757 N.W.2d 239. In *Rhoden*, we held that the provision in Iowa Code section 364.22 regarding the distribution of monies collected in municipal infractions applied only where the penalties were "collected by the court." *Id.* at 241. If the city and a citizen wish to negotiate a settlement short of the filing of a municipal infraction, they may do so without violating Iowa Code section 364.22(7).

Under these principles, we find two problems emerge with respect to the ordinance. First, it provides that a person who does not respond to a notice of citation served by first-class mail pursuant to the ordinance "waives all defenses" and is liable the civil fine under the ordinance. Second, the ordinance purports to impose liability if a person who has proceeded through the administrative process fails to timely request that the City file a municipal infraction. *Id.* But, as seen above, liability for a municipal infraction can only be determined through the municipal infraction process and upon the entry of a judgment by the court. S*ee* Iowa Code § 364.22(4), (5)(*b*) (requiring city to file municipal infraction citations with the district court and with the county treasurer's office); *id.* § 364.22(10)(*a*)(1) (civil penalty may be imposed by court after entry of judgment).

The statute does provide for a default mechanism if the defendant fails to respond. *See id.* § 364.22(7). But the default provision kicks in only when the court determines that a person has been served as provided in Iowa Code section 364.22(4) (providing for service of a notice by personal service, certified mail, or publication and requiring that the notice, among other things, clearly indicate the time and place of a *court appearance* and the penalty for failure to appear *in court*) and the court further determines that the failure to respond was without good cause.

*Id.* § 364.22(7). If these requirements are met, the statute provides that the court shall enter judgment against the defendant. *Id.*

Under the statute, it is clear that any liability that might arise from the failure of a defendant to respond to a municipal infraction is subject to judicial supervision under the standards elaborated in Iowa Code section 364.22. Such liability does not arise automatically as a result of a failure of a defendant to meet the procedural requirements of a local ordinance.

We conclude the provisions of the ordinance that purportedly impose liability on a protesting vehicle owner who does not respond to a notice of violation or who does not timely file a request with the City to institute a municipal infraction proceeding at the conclusion of the administrative process are irreconcilable with the provisions of Iowa Code section 364.22. Upholding these provisions of the ordinance would be tantamount to choosing the City's enactment over the legislature's enactment, contrary to *Seymour*, 755 N.W.2d at 541. If the City wishes to enforce liability under its ordinance upon a vehicle owner who does not voluntarily agree to pay, it must institute a municipal infraction action under Iowa Code section 364.22. As a result, we conclude that the district court erred in granting summary judgment to the defendant on the question of whether Iowa Code section 364.22 preempted the ordinance.

The plaintiffs' second preemption challenge arises out of their argument that the ATE program is irreconcilable with the rules established by the IDOT related to ATE systems. Because we have ruled that the IDOT rules are invalid in *City of Des Moines*, 911 N.W.2d at 434, the plaintiffs' second preemption claim is without merit.

The plaintiffs' final preemption claim relates to the fact that government-owned vehicles are not included in the Nlets database and therefore are not subject to ATE enforcement. The plaintiffs claim that this reality is irreconcilable with Iowa Code section 321.230. We do not agree. Cedar Rapids has not enacted a statute or rule that is inconsistent with the notion that government-owned vehicles are generally subject to the rules of the road. Instead, Cedar Rapids had implemented an ATE program that does not capture government-owned vehicles that may be speeding. That does not mean that the law does not apply to government-owned vehicles, but only that government-owned vehicles may evade a method of detection. We do not see a clash of irreconcilable legal provisions here.

### B. Procedural Due Process.

1. *Introduction.* In addition to substantive due process, plaintiffs launch a series of claims based on notions of procedural due process under the Iowa Constitution, article I, section 9. The plaintiffs have not suggested that we should follow different substantive standards under the Iowa Constitution than would be applied to procedural due process claims under the Federal Constitution. As a result, we apply the substantive federal standards, reserving the right to apply these standards in a more stringent fashion than under federal caselaw. *See State v. Kooima*, 833 N.W.2d 202, 206 (Iowa 2013); *RACI II*, 675 N.W.2d at 5–7.

A party claiming a violation of procedural due process must first show an impairment of an interest in life, liberty, or property by government action. *State v. Russell*, 897 N.W.2d 717, 732–33 (Iowa 2017); *State v. Seering*, 701 N.W.2d 655, 665 (Iowa 2005). Once a protected interest has been established, the next question is what

procedural minima must be provided before the government may deprive the complaining party of the protected interest. *In re C.M.*, 652 N.W.2d 204, 212 (Iowa 2002); *Bowers v. Polk Cty. Bd. of Supervisors*, 638 N.W.2d 682, 691 (Iowa 2002). Ordinarily, the procedural minima include two components—notice and an opportunity to be heard on the issue. *Bowers*, 638 N.W.2d at 690–91.

In considering procedural due process claims, it is important to distinguish civil from criminal cases. *See Shavitz*, 270 F. Supp. 2d at 712. The due process standards for criminal cases are more stringent. *See Comm. on Prof'l Ethics & Conduct v. Durham*, 279 N.W.2d 280, 284 (Iowa 1979). Here, the plaintiffs make no claim that the ATE ordinance is criminal in nature. We therefore evaluate the ATE ordinance under the procedural due process standard for civil matters.

2. *Positions of the parties.* At the outset, plaintiffs seek to merge their preemption argument with procedural due process.[7] With respect to their due process argument, the Plaintiffs assert that because the remedies under the ATE ordinance are inconsistent with the procedural requirements related to municipal infractions provided in Iowa Code section 364.22(6), a violation of due process is present.

According to plaintiffs, the procedures outlined in Iowa Code section 364.22 provide "the legislative measure" of due process protection. Plaintiffs thus assert there is no need to engage in further substantive analysis of the constitutionally required notice and opportunity to be heard because the legislature has provided it for us.

---

[7]Procedural due process consists of two elements: (1) notice and (2) an opportunity to be heard. *Lewis v. Jaeger*, 818 N.W.2d 165, 181 (Iowa 2012). The plaintiffs attack the opportunity-to-be-heard prong of due process, but they do not attack the notice prong. We thus do not consider whether alleged misrepresentations in the various notices sent out by the City as part of the ATE program violate the notice requirements of procedural due process.

The plaintiffs next attack the opportunity to be heard provided by Cedar Rapids. The plaintiffs assert that the process provided by the City does not meet procedural due process requirements under the balancing test announced by the United States Supreme Court in *Mathews*, 424 U.S. at 335, 96 S. Ct. at 903. Under the familiar tripartite *Mathews* test, the court considers (1) the nature of the interest involved; (2) "the risk of an erroneous deprivation of such interests through the procedures used"; and (3) "the [g]overnment's interest, including the function involved, and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Id.*

Plaintiffs argue that they have a property interest in "not being subject to irrational monetary fines." *Jacobsma*, 862 N.W.2d at 345. Their property interest is heightened, according to plaintiffs, by the time lost in the administrative process and by the possibility of being subject to collection procedures, including reporting to a credit-reporting agency and a civil lawsuit.

With respect to the erroneous deprivation prong of the *Mathews* test, plaintiffs highlight that Gatso employees, not police officers, make the initial determination of who is subject to enforcement using unidentified standards. In addition, the notice of violation sent to vehicle owners threatens collection actions for unpaid civil fines, which plaintiffs assert seeks to deter vehicle owners from asserting their right to contest the citation. Finally, plaintiffs note that at the administrative hearings, no evidence is produced related to the calibration of the Gatso equipment; the hearing officers use a preponderance-of-evidence standard rather than a clear, satisfactory, and convincing standard required by Iowa Code section 364.22; and no meaningful opportunity to present evidence is provided.

On the governmental interest prong of the *Mathews* test, plaintiffs characterize the government's interest as not significant. Plaintiffs cite the IDOT findings, claiming there was no support for the placement of the ATE equipment at two locations and with respect to the other two locations, the ATE systems were outside the perceived point of danger along I-380. Plaintiffs argue that the costs of following the legislature's processes for municipal infractions cannot be considered unduly burdensome and cannot be used to deprive the plaintiffs of constitutionally required due process.

These defects, according to the plaintiffs, are not cured by later providing adequate legal process. The plaintiffs cite *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S. Ct. 80 (1972). In *Ward*, the United States Supreme Court noted that "the State's trial court procedure [could not] be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication."[8] *Id.* at 61, 93 S. Ct. at 84.

Cedar Rapids asserts that the notice of violation used by the ATE system does not amount to a notice of a municipal infraction. In effect, Cedar Rapids argues that an ATE citation only ripens into a municipal infraction when the vehicle owner requests the City to file a municipal

---

[8]In their appellate brief, Plaintiffs raise two additional due process arguments. First, plaintiffs assert that the administrative hearing officers provided by Cedar Rapids are not impartial. Fact-bound challenges to the impartiality of hearing officers in ATE systems have been made in a number of cases. *See, e.g.*, *Bevis*, 686 F.3d at 281 & n.2 (finding that hearing officer employed by municipal executive alone does not offend due process); *Gardner*, 656 F. Supp. 2d at 762 (noting plaintiff submitted no evidence of actual bias or prejudgment); *Shavitz*, 270 F. Supp. 2d at 720 (finding no evidence of partiality sufficient to override "presumption of honesty and integrity" (quoting *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S. Ct. 1456, 1464 (1975))). Second, plaintiffs argue that the enforcement of Cedar Rapids' ordinance relies upon an "irrebuttable presumption" that the vehicle owner is responsible for the infraction. Because the district court did not rule upon either of these issues, they are waived on appeal. *Meier v. Senecaut*, 641 N.W.2d 532, 541 (Iowa 2002).

infraction in small claims court. As a result, the administrative process is not contrary to Iowa Code section 364.22.

Cedar Rapids agrees with the plaintiffs that the proper test for determining a procedural due process violation is the *Mathews* test. Cedar Rapids does not dispute that plaintiffs have a property interest in avoiding a fine, but that interest, according to the City, is not particularly strong when the fine is $75. *See Hughes*, 112 F. Supp. 3d at 846.

On the risk-of-erroneous-deprivation prong of the *Mathews* test, Cedar Rapids asserts that the plaintiffs overlook the fact that use of the administrative process is optional and not mandatory. According to Cedar Rapids, the plain language of the ordinance makes clear the optional nature of the administrative process. *See* Cedar Rapids, Iowa, Mun. Code § 61.138(e)(1)–(2).

In any event, Cedar Rapids argues that the administrative process provides due process. Cedar Rapids challenges the plaintiffs' assertion that Gatso makes the initial determination of whether to issue a citation, noting that under the ordinance a police officer makes the initial decision. *See id.* § 61.138(a). Cedar Rapids further asserts that the fact that Gatso filters out a substantial number of events for enforcement due to difficulties in reading the license plate, the lack of vehicle identification from the Nlets database search, or the presence of an emergency vehicle with lights on, does not create a risk of erroneous deprivation for those events actually forwarded to Cedar Rapids law enforcement for evaluation.

Cedar Rapids concedes that the administrative hearings are informal, but emphasizes that due to the availability of a small claims court action an individual is no worse off as a result of participating in such a hearing. In any event, Cedar Rapids asserts that there is a

governmental interest in out-of-court resolution of traffic charges. *See City of Des Moines v. Iowa Dist. Ct.*, 431 N.W.2d 764, 767 (Iowa 1988).

3. *Discussion.* We begin with a brief discussion of the interplay between Iowa Code section 364.22 and due process. A mere violation of a statute does not give rise to a due process violation as the statute may provide more process than is constitutionally required. *Sevin,* 621 F. Supp. 2d at 387. Thus, violation of Iowa Code section 364.22 may give rise to a claim of a statutory violation, but it does not automatically translate into a claim of a constitutional violation. We therefore reject plaintiff's first contention that violation of the statute ends the procedural due process constitutional analysis.[9]

The question of whether the process outlined in the ATE ordinance complies with due process under *Mathews* really raises two questions. First, does the process in the ATE ordinance satisfy due process? Second, does the ATE ordinance as actually implemented, with the notice provided in the Notice of Violation and other documents, violate due process?

On the question of whether the ATE ordinance on its face satisfies due process, we think it generally does. The ATE ordinance provides for an administrative hearing, but further provides that in lieu of an administrative hearing, a vehicle owner may request the City issue a municipal infraction and the vehicle owner receive a hearing in small claims court. *See* Cedar Rapids, Iowa, Mun. Code § 61.138(e)(1)–(2).

---

[9]Nothing in *Ghost Player, L.L.C. v. State*, 880 N.W.2d 323 (Iowa 2015), is to the contrary. In *Ghost Player*, the court recognized that if the legislature established a higher standard than required by constitutional notions of due process, a party was entitled to receive the higher legislative standard. *Id.* at 330 (observing that the "legislature did not mandate a contested hearing process to review and award the tax credits"). Such a party is entitled to the more elaborate process not because of application of procedural due process, but because of the terms of the statute itself.

There is no question that a hearing in small claims court satisfied due process on the question of a minor traffic fine. The procedural due process claim cannot focus on only a part of the process afforded under the ordinance but must consider the entire panoply of available procedures. *See Nichols ex rel. Nichols v. DeStefano*, 70 P.3d 505, 507 (Colo. App. 2002), *aff'd*, 84 P.3d 496 (Colo. 2004) (en banc) (per curiam); *Broadway & 67th St. Corp. v. City of New York*, 475 N.Y.S.2d 1, 5 (App. Div. 1984).

There is, however, at least one complication. The ATE ordinance puts the burden on a vehicle owner to request a hearing in small claims court. *See* Cedar Rapids, Iowa, Mun. Code § 61.138 (e)(2). Is a requirement that a citizen take affirmative action to obtain a hearing before a small claims court consistent with due process? We think it is. The amount at stake is relatively small, *see Sevin*, 621 F. Supp. 2d at 386, and the burden of requesting a hearing is not heavy. Further, the ordinances provide a vehicle owner with the opportunity for a prior administrative hearing to challenge the automated traffic citation in an informal proceeding. We do not think this combination of an administrative hearing, with the option of a small claims hearing, violates *Mathews*.

## VI. Unlawful Delegation Claims.

**A. Overview of Plaintiffs' Unlawful Delegation Claims.** Plaintiffs argue that the ATE system improperly delegates governmental authority to Gatso, a private entity. They claim that Gatso makes the discretionary decision of which vehicle owners should be considered by Cedar Rapids to receive potential citations. *See Arem*, 154 So. 3d at 365. The plaintiffs assert that Gatso rejects up to forty percent of the images they receive under standards that are entirely nontransparent to the

outside and not addressed in the ATE ordinance. The plaintiffs characterize review of potential violations by police officers as a "cursory" review.

Plaintiffs further assert that Cedar Rapids delegates police powers to Gatso by authorizing the corporation to access the Nlets database to run license plate checks on behalf of Cedar Rapids. According to the plaintiffs, Nlets was created to serve the law enforcement community, not private entities like Gatso.

Plaintiffs next suggest that Gatso has determined that only those vehicles detected as traveling eleven miles per hour or more over the speed limit by Gatso equipment should be issued citations. Plaintiffs further claim that enforcement of this rule by Gatso requires "judgment and discretion."

Plaintiffs additionally attack the delegation of communications functions from Cedar Rapids to Gatso. Gatso provides a hotline number on each notice of violation that it issues. Gatso further operates a website for the City that provides information related to the ordinance as well as a payment portal. In order to contest a citation, a vehicle owner has to send the document to Gatso's location in Beverly, Massachusetts.

Finally, the plaintiffs attack the delegation of police powers to hearing officers who are simply volunteers. According to the plaintiffs, delegation of quasi-judicial functions is proscribed. *See Bunger v. Iowa High Sch. Athletic Ass'n,* 197 N.W.2d 555, 560 (Iowa 1972).[10]

Cedar Rapids responds by emphasizing that the activities of Gatso are ministerial and not discretionary. For example, Cedar Rapids

---

[10]Plaintiffs also claimed that the IDOT rules and the IDOT order preempted Cedar Rapids from engaging in its ATE program. Because we have found the IDOT rules invalid, that claim is moot. *See City of Des Moines,* 911 N.W.2d at 434.

stresses that Cedar Rapids law enforcement officers make the final determination regarding who is issued traffic citations. According to Cedar Rapids, Gatso does not forward to the City images when the license plates are not visible, when the captured image is an emergency vehicle with lights on, and when the Nlets database search failed to identify a vehicle owner. As a result, the screening process involves little discretion or judgement.

With respect to the use of the Nlets database by Gatso, Cedar Rapids points out that the only use of the database by Gatso is to match license plates with registered vehicle owners. Such matching, according to Cedar Rapids, does not involve a discretionary decision.

Cedar Rapids maintains that there is nothing in the record to support plaintiffs' claim that Gatso determined that only vehicle speeds recorded as eleven miles per hour over the speed limit should be issued citations. In any event, Cedar Rapids maintains there would be nothing wrong with it implementing such a policy.

Regarding the calibration of equipment, Cedar Rapids argues that the record shows the Cedar Rapids police department does test the calibration at least quarterly. In any event, Cedar Rapids asserts that the act of calibrating equipment is ministerial in nature.

Finally, with respect to the alleged delegation of power to volunteer hearing officers, Cedar Rapids asserts that volunteer hearing officers make no determination about whether to issue a notice of violation. And, when the hearing officer finds in Cedar Rapids' favor, the decision is subject to district court review in the form of a municipal infraction.

**B. Overview of Unlawful Delegation Claims.** Political accountability is at the very heart of democratic government. If democracy is to function, it is essential that public decision-making be

transparent and that the public may hold officials responsible for their actions. As a result, it is essential that governmental functions, in fact, be executed by public officials and not an insulated private entity undisciplined by ordinary political restraints. *See Warren Cty. Bd. of Health v. Warren Cty. Bd. of Supervisors*, 654 N.W.2d 910, 913–14 (Iowa 2002) ("[A] governmental subdivision cannot delegate the right to make decisions it has been empowered to make."). The unlawful delegation doctrine "expresses the fundamental concept that we are to be governed by our duly elected representatives." *Sedlak v. Dick*, 887 P.2d 1119, 1135 (Kan. 1995).

While the general nondelegation principles are clearly stated, the law of unlawful delegation has been criticized as unprincipled. David M. Lawrence, *Private Exercise of Governmental Power*, 61 Ind. L.J. 647, 694 (1986) [hereinafter Lawrence]. There is simply no consensus on the proper approach to the question of unlawful delegation. *See* James M. Rice, Note, *The Private Nondelegation Doctrine: Preventing the Delegation of Regulatory Authority to Private Parties and International Organizations*, 105 Calif. L. Rev. 539, 557 (2017) [hereinafter Rice] (noting "no consensus on a model for defining the activities that the government must perform").

But there are a couple principles that emerge from the caselaw. First, it seems apparent to many observers that at least some state courts have been more willing to closely scrutinize unlawful delegations than federal courts. *See Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 468 (Tex. 1997) (noting that while federal courts have generally been reluctant to use the nondelegation doctrine to invalidate laws, state courts have not been so chary); Gary J. Greco, Survey, *Standards or Safeguards: A Survey of the Delegation Doctrine in*

*the States*, 8 Admin. L.J. Am. U. 567, 578 (1994) [hereinafter Greco] (stating that "the state courts have upheld broad delegations more reluctantly" than federal courts); Lawrence, 61 Ind. L.J. at 649 ("Private exercise of federally delegated power is no longer a federal constitutional issue.").

Second, while many of the cases and authorities deal with delegation of statutory power to administrative agencies, *see, e.g.*, Greco, 8 Admin. L.J. Am. U. at 568; Lawrence, 61 Ind. L.J. at 664, a number of authorities distinguish between delegation of statutory authority to an administrative agency and delegation of authority to a private party, *see* Rice, 105 Calif. L. Rev. at 545. As noted many years ago by the United States Supreme Court in *Carter v. Carter Coal Co.*, handing off regulatory power to a private entity is "legislative delegation in its most obnoxious form." 298 U.S. 238, 311, 56 S. Ct. 855, 873 (1936). And as recently noted by Justice Alito, "Liberty requires accountability. . . . Government officials can wield power without owning up to the consequences. One way the Government can regulate without accountability is by passing off a Government operation as an independent private concern." *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. ___, ___, 135 S. Ct. 1225, 1234 (2015) (Alito, J., concurring).

The Texas Supreme Court emphasized the distinction between statutory delegations to administrative agencies and delegations to private entities in *Texas Boll Weevil*, 952 S.W.2d at 469. As noted by the court, delegations to private entities are particularly sensitive because the private delegatee "may have a personal or pecuniary interest which is inconsistent with or repugnant to the public interest to be served." *Id.* The Texas court further observed that when "public powers are abandoned to those who are neither elected by the people, appointed by

a public official or entity, nor employed by the government" a more searching inquiry is required. *Id.* The *Texas Boll Weevil* court developed an eight-factor test to determine the validity of delegations of public authority to private agencies:

> 1. Are the private delegate[e]'s actions subject to meaningful review by a state agency or other branch of state government?
>
> 2. Are the persons affected by the private delegate[e]'s actions adequately represented in the decisionmaking process?
>
> 3  Is the private delegate[e]'s power limited to making rules, or does the delegate[e] also apply the law to particular individuals?
>
> 4. Does the private delegate[e] have a pecuniary or other personal interest that may conflict with his or her public functions?
>
> 5. Is the private delegate[e] empowered to define criminal acts or impose criminal sanctions?
>
> 6. Is the delegation narrow in duration, extent, and subject matter?
>
> 7. Does the private delegate[e] possesses special qualifications or training for the task delegated to it?
>
> 8. Has the Legislature provided sufficient standards to guide the private delegate[e] in its work?

*Id.* at 472.

Third, in addition to recognizing the potential for more aggressive state court scrutiny of unlawful delegation than that found in the federal courts and the distinction between delegation to other public officials and delegation to a private entity, the cases also recognize that some types of government functions are simply not delegable. For example, the Secretary of Defense cannot delegate war-making authority to the Rand Corporation, and the Attorney General cannot delegate the decision whether to prosecute to a private attorney. *See* Paul R. Verkuil, *Public*

*Law Limitations on Privatization of Government Functions*, 84 N.C. L. Rev. 397, 425 (2006). In federal procurement, the Office of Management and Budget's Circular A-76 prohibits contracting of "inherently governmental" activities, including activities that involve "[d]etermining, protecting, and advancing economic . . . interests by . . . contract management" and activities "[s]ignificantly affecting the life, liberty, or property of private persons." *Id.* at 438.

Our caselaw on unlawful delegation of authority is limited. Some Iowa cases deal with the question of delegation of authority to administrative agencies or government officials. *See Gabrilson v. Flynn*, 554 N.W.2d 267, 276 (Iowa 1996) (rejecting school board delegation of authority to determine who has access to school records to school official); *Marco Dev. Corp v. City of Cedar Falls*, 473 N.W.2d 41, 44 (Iowa 1991) (striking down delegation of authority to commit city to widen street to city official); *Iron Workers Local No. 67 v. Hart*, 191 N.W.2d 758, 773 (Iowa 1971) (upholding delegation of power to the Iowa Civil Rights Commission).

However, in *Bunger*, we considered the delegation of rulemaking authority by high schools to the Iowa High School Athletic Association (IHSAA). 197 N.W.2d at 559. The IHSAA both arranged interscholastic athletic events and had bylaws requiring schools to ban student athletes engaging in undesirable conduct. *Id.* at 557–58. We held that the delegation of authority to the IHSAA with respect to misconduct of athletes was an unlawful delegation of school authority. *Id.* at 563. We stated, "Where the act to be done involves judgment or discretion, it cannot be delegated to an agent or committee." *Id.* at 560 (quoting *Kinney v. Howard*, 133 Iowa 94, 105, 110 N.W. 282, 286 (1907)); *see also*

*Warren Cty. Bd. of Health,* 654 N.W.2d at 914 (noting "delegable acts typically involve functions that require little judgment or discretion").

In *Bunger*, we confronted the argument that a high school that did not like the good-conduct rules of the IHSAA could simply withdraw from the association. *Id.* at 561. We rejected the argument, noting that it was important in considering unlawful delegation to look at "the realities of the situation." *Id.* We concluded that the "choice" to leave the IHSAA was not a real choice because such departure would dramatically undermine the competitive opportunities for high school athletes. *Id.* Our approach in *Bunger* contrasts with the approaches of a number of states who took a more formalistic approach to the ability of a school district to withdraw from statewide athletic organizations. *See Quimby v. School District No. 21*, 455 P.2d 1019, 1021–22 (Ariz. Ct. App. 1969); *Hebert v. Ventetuolo*, 480 A.2d 403, 407 (R.I. 1984); *Anderson v. S.D. High Sch. Activities Ass'n*, 247 N.W.2d 481, 484 (S.D. 1976).

We also considered an unlawful delegation problem in *Gamel v. Veterans Memorial Auditorium Commission*, 272 N.W.2d 472 (Iowa 1978). In *Gamel*, we considered the validity of a statute that required that the commission members controlling the operations of the Veterans Memorial Auditorium had to be members of certain veterans groups. *Id.* at 474. We adopted the "strict rule" embraced by Justice McCormick in his dissent in *Vietnam Veterans Against the War v. Veterans Memorial Auditorium Commission*, 211 N.W.2d 333, 339 (1973) (McCormick, J., dissenting), namely, "that private individuals cannot be empowered to select boards to spend public funds, no matter how well qualified they might be." *Gamel*, 272 N.W.2d at 476. We reserved the question of whether other powers might survive scrutiny if proper safeguards or special qualifications are present. *Id.* But we concluded that in light of

the special interests involved in the power to spend public funds, those interests require "a strict rule against any delegation of sovereign power." *Id.*

**C. Caselaw Involving Unlawful Delegation Challenges and ATE Systems.** There is a small body of caselaw considering unlawful delegation challenges to ATE systems. In *Arem*, a Florida appellate court held that the delegation of initial screening of violations to a private company was an unlawful delegation. 154 So. 3d at 365. Under the challenged ATE system, the company first reviewed captured images and made an initial determination of whether the image met the requirements of the ordinance and the agreement between the contractor and the municipality. *Id.* at 364–65. According to the *Arem* court,

> For all practical purposes, it is the *vendor* that decides which cases the [police officer] gets to review; it is the *vendor* who initially determines who is subject to prosecution for a red light violation; it is the *vendor* that obtains the information necessary for the completion of the citation; it is the *vendor* that creates the actual citation; it is the *vendor* that issues the citation to the registered owner of the vehicle; and, it is the *vendor* that eventually transmits the traffic citation data to the court.

*Id.* at 365.

Under the circumstances, the *Arem* court concluded that the law enforcement officer merely acquiesces in the vendor's decision to issue the citation. *Id.* Because Florida law only authorized law enforcement officers, and not third party vendors, to issue traffic tickets, the court found an unlawful delegation of authority to the third-party contractor. *Id.*

A somewhat different approach was taken by another Florida appellate court in *State ex rel. City of Aventura v. Jimenez* (*Jimenez I*), 211 So. 3d 158 (Fla. Dist. Ct. App. 2016), *aff'd sub nom. Jimenez II*, 246

So. 3d at 231. In this case, as in *Arem*, the plaintiff asserted that a red-light citation generated by an ATE system was unlawful because the vendor had unfettered discretion that exceeded the city's statutory authority to use an agent to review images under the applicable Florida statute. *Id.* at 159–60. Unlike in *Arem*, the appellate court held that there was no unlawful delegation of authority. *Jimenez I*, 211 So. 3d at 170.

The *Jimenez I* court emphasized that under Florida law, a government entity can outsource services and use private vendors

> provided the essential decisions regarding the exercise of government power are retained by the government or controlled by that body through the promulgation of standards that prevent the private party from having unfettered discretion in the exercise of government power.

*Id.* at 165–66. The court emphasized that the act of determining which images established a red-light violation is a ministerial act. *Id.* at 166. According to the court, "[W]hether a picture of a traffic light shows red involves no discretionary judgment." *Id.* The court went on to point out that "the Vendor exercises no unfettered discretion when it determines the camera misfired, the traffic light in the image displays green, or the vehicle license plate number in the image is illegible." *Id.* Further, the court noted that the city had established guidelines related to the determination of which images should be forwarded to the city for potential prosecution. *Id.* at 167–68.

The *Jimenez I* court distinguished the *Arem* case. *Id.* at 168–70. According to the court, "*Arem* is distinguished from the instant case because there was a different contract, there were no standards or guidelines promulgated by the municipality, the Vendor determined probable cause, and the City officer merely acquiesced in the Vendor's

determination." *Id.* at 168. The *Jimenez I* court proceeded to canvass the differences between the contract in the case before it and the contract in *Arem. Id.* at 168–69.

The Florida appellate court certified the question of delegation to the Florida Supreme Court. *Id.* at 171; *see Jimenez II*, 246 So. 3d 219. The Florida Supreme Court focused on the meaning of the term "review" in the applicable statute. *Jimenez II*, 246 So. 3d at 225. According to the court, there was no reason to believe that the Florida legislature used the term in its most restrictive sense and that the notion of a review necessarily involves some evaluative component. *Id.* at 227–28. The court further declared that the Florida statute authorized local government

> to contract with a private third-party vendor to review and sort information from red light cameras, *in accordance with written guidelines provided by the local government,* before sending that information to a trained traffic enforcement officer who determines whether probable cause exists and a citation should be issued.

*Id.* at 229 (emphasis added). Because the city provided the vendor with written guidelines to use when reviewing and sorting the images, the ATE program did not exceed the authority granted the vendor by the ATE statute to review images. *Id.*

Finally, in *Falkner,* a federal district court found that a red-light ATE system did not unlawfully delegate power to a private entity even when a law enforcement officer did not approve a citation. 150 F. Supp. 3d at 982. The *Falkner* court noted that the relevant statutes governing red-light enforcement provided "a thorough framework . . ., [including] a two-layer-technician-review process, leaving no room for the traffic compliance administrator or technicians to 'make the law.'" *Id.*

The court further emphasized that the private vendor had no incentives to act on private interests in determining violations. *Id.* at 983.

Finally, the question of unlawful delegation was briefly addressed in *Hughes*, 840 F.3d 987. In this case, the United States Court of Appeals for the Eighth Circuit in a conclusory fashion held that the ATE system did not involve an unlawful delegation. *Id.* at 997–98.

**D. Factual Record on Delegation Issues.** There is no dispute that Gatso is an independent contractor providing services to the City. Further, under its contract with the City to provide ATE services, Gatso has earned substantial revenues. Beginning in 2010 and ending on January 26, 2016, Gatso received over $10 million in payments from the City.

Under the contract between the City and Gatso, Gatso was responsible for the initial processing of "violation packages." The contract does not provide details regarding the processing of violation packages by Gatso. In addition to the contract, however, the City and Gatso agreed on business rules/processing guidelines. The business rules/processing guidelines stated that the speed of the camera system "will be configured 11 mph over the posted speed limit" and that "vehicles traveling at 11 mph and over will be issued citations."

According to Gatso, after August 29, 2014, Gatso employees processed an event by reviewing footage from ATE camera locations and then submitted license plate information as a query to the Nlets database, a law enforcement tool that the City authorized Gatso to utilize.[11] If the Nlets query generated a response of "invalid" or "private" or returned with partial information, Gatso rejected the event and no

---

[11]Prior to August 29, 2014, Gatso subcontracted the Nlets query services to CMA Consulting Services, Inc., in Latham, New York.

further action was taken. Sworn officers of the City approved or rejected the events submitted to the City. If the City rejected an event, no notice of violation was issued. If the City accepted an event, Gatso sent a notice of violation to the vehicle owner.

Since August 29, 2014,[12] Gatso declared in interrogatory answers that "the City has used the Gatso Xilium system," which includes a number of reasons for rejection of a potential violation. The rejection reasons in the Gatso Xilium system cover both red-light and speed violations. Among the Gatso Xilium rejection reasons that seem to apply to speed violations are camera image, erroneous lane trigger, plate not readable, dealer plate, out-of-country plate, vehicle mismatch, owner/address information missing, vehicle information missing, returned invalid, and weather. Although Gatso's interrogatory answers indicate that "the [C]ity has used the Gatso Xilium system," the summary judgment record does not directly establish whether the City approved the use or whether it knew about the features of the system. All in all, Gatso states that approximately sixty percent of the images captured at all its ATE locations (including speed and red-light cameras) are sent to police for potential violations.

The ATE ordinance provides that a vehicle owner can contest a citation before a hearing officer and if the hearing officer upholds the citation, the vehicle owner may request the City file a municipal infraction in small claims court. Notices that are sent out by Gatso, however, suggest that the hearing officers utilized by the City have the power to enter orders and judgments.

---

[12]Prior to August 29, 2014, the CMA Site Violation manager system was utilized.

**E. Unlawful Delegation Challenges to Use of the Nlets Database, Creation of a Hot Line, Assembly of Violation Packages.** We first consider whether the use of the Nlets database by Gatso as authorized by Cedar Rapids amounts to an unlawful delegation. We conclude that it does not. It is difficult to see how Cedar Rapids' permission to Gatso to use the Nlets database to match drivers' license numbers with vehicle owners involves an exercise of judgment that might run afoul of the nondelegation doctrine.

We come to the same conclusion regarding Gatso's responsibility to maintain a hotline to provide information about the ATE system. The creation and implementation of a hotline to provide information to persons about the ATE system does not involve an exercise of judgment by Gatso.

We next consider the plaintiffs' claim that the City unlawfully delegated power to Gatso because Gatso assembled violation packages that were forwarded to the City and Gatso was responsible for the mailing of violation notices to vehicle owners. We conclude that Gatso's function in assembling violation packages is ministerial in nature. And the sending of notices of violation occurred only after review by a City police officer. The mere mailing of a notice approved by the City does not involve the exercise of the kind of judgment that might amount to an unlawful delegation. The judgment call that was involved in the determination of who should be sent notices of violation, namely, the decision to forward to the City only images of vehicles exceeding the speed limit by eleven miles per hour, was approved by Cedar Rapids as part of its business rules governing the ATE project. There was no unlawful delegation when the City approved the specifically challenged policy as part of its business rules governing an ATE system.

**F. Unlawful Delegation Challenge to Authority to Initiate ATE Enforcement Action.** With respect to the unlawful delegation of authority to initiate ATE action, at least one case seems to support the plaintiffs' position. In *Arem*, a Florida appellate court decided that a procedure similar to the one in this case in a red-light ATE system amounted to an unlawful delegation of government power to a private entity even though a traffic infraction enforcement officer of the city pushed an accept button before enforcement commenced. 154 So. 3d at 361–65. The *Arem* court emphasized that the private vendor made an initial determination of which photographs to forward to the city for approval of a citation and that the city officials never received photos of motor vehicles when the private vendor decided that an infraction did not occur or was not supported. *Id.* at 365.

Yet, *Jimenez I* puts *Arem* in perspective. *Jimenez I* characterized the action of identifying infractions as ministerial. 211 So. 3d at 166. But, *Jimenez I* also pointed to the guidelines created by the municipality for filtering events, called "business rules," in which the private vendor operated, a framework that does not appear in the summary judgment record here. *Id.* at 162. While Cedar Rapids did approve "business rules" here, they do not include any rules for filtering events.

A concerning factor is the contingency fee nature of the contract between the City and Gatso, giving the contractor incentive to forward as many citations as possible. Yet, here a police officer reviews each violation package before a citation is issued.

Ultimately, we agree with Cedar Rapids. The plaintiffs claim the ATE system *automatically* produces digital images of the rear of vehicles that are detected as traveling at more than eleven miles per hour over the speed limit. No discretion is involved in the development of these images.

The record then shows that Gatso reviews the automatically triggered images and filters out events where the license plate was not fully visible, no match was generated between the license plate number and the vehicle owner in the Nlet database, or the captured image shows an emergency vehicle with its emergency lights on. Excluding these events is ministerial in nature. The images sent to Cedar Rapids are then reviewed by a Cedar Rapids law enforcement officer and approved before Gatso sends a notice of violation to the vehicle owner. While it might have been preferable if the initial screening decision by Gatso were subject to a transparent regulatory framework, as in *Jimenez I*, 211 So. 3d 158, we do not think the lack of such a framework undermines the ministerial character of the initial screening decisions by *Gatso*. We conclude Cedar Rapids was entitled to summary judgment on the plaintiffs' delegation claim on this particular ground.

**G. Unlawful Delegation Through Use of Volunteers.** We now turn to the question of whether Cedar Rapids' use of recruited volunteers as hearing officers involves an unlawful delegation of power. We preliminarily note that while the district court in its order on summary judgment recognized that the plaintiffs made this claim in its summary of the plaintiffs' claims, the district court did not enter a ruling on this specific question. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). As a result, there is a serious question regarding preservation.

In any event, the argument is without merit. The volunteers are not serving in their private capacity when they act as hearing officers, but to the extent they exercise governmental powers, they are acting on

behalf of Cedar Rapids. Although there is no set criteria for appointment of hearing officers, we see the situation as no different, for purposes of unlawful delegation analysis, than when a city manager recruits citizens to volunteer to serve on various boards and commissions of the city. In this setting, Cedar Rapids has not delegated its powers, but has recruited citizens to help exercise its powers. The district court did not err in granting summary judgment to Cedar Rapids on the delegation of power claims related to volunteer citizen hearing officers.

**H. Unlawful Delegation Challenge as a Result of Calibration.** The last substantial delegation question relates to the calibration of the ATE equipment. On this issue, the court is evenly divided. Two members of the court (Chief Justice Cady and Justice Wiggins) join me in concluding that the district court erred in granting summary judgment on the unlawful delegation issue as it relates to calibration. We would find that the moving party failed to show as a matter of law that the calibration function did not unlawfully involve the exercise of judgment. Three members of the court (Justices Waterman, Mansfield, and Zager) are of the opinion that the district court properly granted summary judgment on the issue. As a result, the district court judgment is affirmed as a matter of law. Iowa Code § 602.4107; *State v. Effler*, 769 N.W.2d 880, 882–83 (Iowa 2009).

**VII. Unjust Enrichment.**

**A. Introduction.** Plaintiffs bring a claim for unjust enrichment. Unjust enrichment is an equitable claim that arises when the plaintiff proves that "the defendant received a benefit that in equity belongs to the plaintiff." *Slade v. M.L.E. Inv. Co.*, 566 N.W.2d 503, 506 (Iowa 1997). The elements of unjust enrichment are (1) enrichment of the defendant, (2) at the expense of the plaintiff, (3) under circumstances that make it

unjust for the defendant to retain the benefit. *State ex. rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 154–55 (Iowa 2001).

It has often been stated that when one makes a voluntary payment, with full knowledge of the facts, unjust enrichment will not lie. *See Lincoln Nat'l Life Ins. v. Fischer*, 235 Iowa 506, 516, 17 N.W.2d 273, 278 (1945) (noting that at common law taxes voluntarily paid could not be recovered). In jurisdictions that recognize the voluntary payment doctrine, a mistake of fact, such as payment to a wrong party, may prevent application of the voluntary payment doctrine, but a mistake of law does not give rise to an unjust enrichment claim. *See, e.g., Case W. Reserve Univ. v. Friedman*, 515 N.E.2d 1004, 1005 (Ohio Ct. App. 1986); *Butcher v. Ameritech Corp.*, 727 N.W.2d 546, 553 (Wis. Ct. App. 2006). In addition, the voluntary payment doctrine traditionally has not applied in cases involving fraud or duress. *See, e.g., Ramirez v. Smart Corp.*, 863 N.E.2d 800, 808 (Ill. App. Ct. 2007); *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 775 (Tex. 2005); *Butcher*, 727 N.W.2d at 553.

The voluntary payment doctrine has come under attack in some quarters. *See* John E. Campbell & Oliver Beatty, Huch v. Charter Communications, Inc.: *Consumer Prey, Corporate Predators, and a Call for the Death of the Voluntary Payment Doctrine Defense*, 46 Val. U. L. Rev. 501, 526–27 (2012) [hereinafter Campbell]. The Restatement (Third) of Restitution and Unjust Enrichments cautions that it should be applied only in the narrow circumstance of when a party pays an obligation who knows that the ultimate risks of liability is uncertain but elects to forgo transaction costs in the matter. *See* Restatement (Third) of Restitution and Unjust Enrichment § 6, cmt. *e* (2011).

A number of states, while not expressly embracing abolition of the voluntary payment rule, have sharply limited its scope. For example, the

fraud exception to the voluntary payment doctrine has been expanded to include "fraud or improper conduct." *See, e.g., Nat'l Enameling & Stamping Co. v. City of St. Louis*, 40 S.W.2d 593, 595 (Mo. 1931) (holding "fraud or improper conduct" negates the voluntary payment defense); *Woodmen of the World Life Ins. Soc'y v. Am. Soc'y of Composers, Authors & Publishers*, 19 N.W.2d 540, 545 (Neb. 1945) (same); *Hawkinson v. Conniff*, 334 P.2d 540, 543 (Wash. 1959) (stating jury instruction on voluntary payment provides "improper conduct or undue advantage" renders payment involuntary). Other cases have broadly defined duress or coercion to include "the exploitation of a superior bargaining position . . . when the stronger party seeks additional leverage by exploiting a vulnerability to which the weaker party . . . is not properly subject." *City of Scottsbluff v. Waste Connections of Neb., Inc.*, 809 N.W.2d 725, 744 (Neb. 2011). Such duress may even include "threats" of judicial process, even if the defendant had a legal right to take a threatened action. *Id.* Another line of cases emphasize that when transactions are unlawful, the voluntary payment doctrine does not apply. *MacDonell v. PHH Mortg. Corp.*, 846 N.Y.S.2d 223, 224 (App. Div. 2007) (barring doctrine where plaintiff asserts a statutory cause of action); *Pratt v. Smart Corp.*, 968 S.W.2d 868, 872 (Tenn. Ct. App. 1997) (holding voluntary payment doctrine "does not come into play in situations involving a transaction that violates public policy"). *See generally* Campbell, 46 Val. U. L. Rev. at 508; Colin E. Flora, *Practitioner's Guide to the Voluntary Payment Doctrine*, 37 S. Ill. U. L.J. 91, 107 (2012).

In *State ex rel. Miller v. Vertrue, Inc.*, we noted that Iowa had not embraced the voluntary payment doctrine and declined to do so in that case. 834 N.W.2d 12, 32 (Iowa 2013). *But see Meyer v. Gotsdiner*, 208 Iowa 677, 681, 226 N.W. 38, 39 (1929) (describing voluntary payment

doctrine as "well settled"). In any event, we noted in *Vertrue* that we would not apply the voluntary payment doctrine in cases involving consumer fraud. *Id.* at 32. We reasoned that where a violation of a consumer fraud statute was shown, not allowing recovery for unjust enrichment would undermine the purpose of the statute. *Id.* We cited cases from other jurisdictions for the proposition that where statutory violations were present, blocking recovery through application of the voluntary payment doctrine would be inequitable. *Id.*

The question of unjust enrichment has been raised in several ATE cases. In *Hughes,* the Eighth Circuit rejected the argument, apparently on the ground that the underlying claims lacked merit and there was therefore no reason to find unjust enrichment. 840 F.3d at 997. Another federal court dismissed unjust enrichment as merely duplicative of other claims. *Leder*, 81 F. Supp. 3d at 227–28 (rejecting unjust enrichment as duplicative of other claims). A number of courts have rejected unjust enrichment under the voluntary payment doctrine. *Id.* at 228; *Ballard,* 419 S.W.3d at 122; *Smith,* 409 S.W.3d at 420.

In two ATE cases, however, the unjust enrichment claim survived appellate review. In *Brunner v. City of Arnold*, the appellate court determined there might have been sufficient duress to avoid application of the voluntary payment doctrine. 427 S.W.3d 201, 235–36 (Mo. Ct. App. 2013), *overruled in part on other grounds in Tupper v. City of St. Louis*, 468 S.W.3d 360, 369 n.7 (Mo. 2015) (en banc). The *Brunner* court also distinguished between payment to the city and payment to the vendor. *Id.* at 235. The *Brunner* court suggested that payment to the vendor might be subject to unjust enrichment. *Id.*

Similarly, in *Damon v. City of Kansas City,* another Missouri appellate court considered a case where the trial court granted a motion

to dismiss an unjust enrichment claim in an ATE case. 419 S.W.3d 162, 194 (Mo. Ct. App. 2013). The plaintiffs alleged, among other things, that they made payments under threat that the city would take further action against them if they did not. *Id.* They alleged that the respondents knew that their efforts were illegal. *Id.* Noting that the voluntary payment doctrine was not available when the payments were made under duress, fraud, or mistake of fact, the Missouri appellate court reversed the trial court's dismissal of the unjust enrichment action. *Id.*

**B. Positions of the Parties.** The plaintiffs argue that as a result of the implementation of the unlawful ordinance, Cedar Rapids and Gatso were unjustly enriched. The plaintiffs reject any application of the voluntary payments doctrine, pointing out that under the facts presented, the payments cannot be considered "voluntary" because of Cedar Rapids' threats in notices to report the plaintiffs to a credit agency. Further, the plaintiffs maintain that Iowa has never adopted the voluntary payments doctrine.

Cedar Rapids argues that because the ATE system is not illegal, it is not unjust for Cedar Rapids and Gatso to keep monies that they have collected. It is also further pointed out that the monies are paid to the City, not to Gatso. Finally, Cedar Rapids additionally points out that plaintiffs Olson and Smith made voluntary payments and, as a result, are not entitled to bring an unjust enrichment claim. *See Meyer*, 208 Iowa at 681, 226 N.W. at 39. Cedar Rapids also notes that Brooks has not paid a fine and thus has no monetary claim against the defendants.

**C. Discussion.** We agree with the line of cases that provide that when a statutory violation is alleged, the doctrine of voluntary payment does not apply. *See MacDonell*, 846 N.Y.S.2d at 224; *Pratt*, 968 S.W.2d at 872; *see also Vertrue*, 834 N.W.2d at 42–43. We have rejected all of

the plaintiffs' constitutional claims and the plaintiffs' delegation challenges except on the calibration issue upon which the court was deadlocked. No unjust enrichment arises from these rejected claims. However, we have reversed the district court on the issue of preemption. Because of this changed legal landscape and because we have rejected the voluntary payment doctrine, we vacate the district court's judgment on unjust enrichment and remand the matter to the district court for further consideration in light of changed posture of the case.

**VIII. Conclusion.**

For the above reasons, we vacate the decision of the court of appeals and affirm in part and reverse in part the judgment of the district court.

**DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Cady, C.J., and Wiggins, J., join this opinion. Zager, J., joins this opinion except for part VI.H. Waterman, J., files a separate opinion concurring in part and dissenting in part. Mansfield, J., files a separate opinion concurring in part and dissenting in part in which Waterman, J., joins in parts I and II and Zager, J., joins in part II. Hecht, J., takes no part.

**WATERMAN**, **Justice (concurring in part and dissenting in part).**

I join most of the court's opinion but concur only in the result for part IV and dissent from parts V.A and VI.H. I write separately to reiterate my call to expressly overrule *Racing Ass'n of Central Iowa v. Fitzgerald* (*RACI II*), 675 N.W.2d 1 (Iowa 2004).[13] I dissent from the court's reversal of summary judgment based on preemption of the default provision in the ordinance. In addition, I join Justice Mansfield's dissent concluding the City of Cedar Rapids did not unlawfully delegate to Gatso calibration of the automated traffic enforcement (ATE) equipment.

## I. RACI II Should Be Overruled.

I am unable to join part IV because it embraces *RACI II*, a precedent that is plainly erroneous. The *RACI II* majority, purporting to apply the federal rational basis test, held that a tax differential for land-based and riverboat casino slot machine revenue violated the equal protection clause of the Iowa Constitution on remand after the unanimous United States Supreme Court held the differential did not violate the Federal Equal Protection Clause. 675 N.W.2d at 3. The *RACI II* majority thereby essentially took the position that the nine Justices of the United States Supreme Court were irrational in applying the same rational basis test in the same case, despite the well-settled and long-standing tradition of judicial deference to legislative classifications. *RACI II* was wrongly decided for the reasons set forth in the eloquent separate dissents by Justices Cady and Carter. *See id.* at 16–17

---

[13]I called for overruling *RACI II* in *Qwest Corp. v. Iowa State Board of Tax Review*, 829 N.W.2d 550, 566 (Iowa 2013) (Waterman, J., concurring), and in *King v. State*, 818 N.W.2d 1, 43 n.28 (Iowa 2012) (Waterman, J., concurring).

(Carter, J., dissenting); *id.* at 17–28 (Cady, J., dissenting); *see also Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 110, 123 S. Ct. 2156, 2161 (2003) (reversing *RACI I* on federal equal protection grounds); *Racing Ass'n of Cent. Iowa v. Fitzgerald* (*RACI I*), 648 N.W.2d 555, 563–64 (Iowa 2002) (Neuman, J., dissenting, joined by Carter and Cady, JJ.).

*RACI II* as a practical matter has been limited to its facts. We have never relied on *RACI II* to strike down another municipal or state legislative enactment. Yet members of this court persist in citing *RACI II* for the view that courts can apply "rational basis with teeth" to declare unconstitutional legislative enactments that do not involve fundamental rights or a protected class. The court's dicta today suggests that litigants can mount evidentiary challenges to ATE ordinances or other laws and that judges can then weigh the "evidence" to strike down a duly enacted law as unconstitutional. In my view, that use of *RACI II* is antidemocratic and contrary to basic principles of self-government. *See Honomichl v. Valley View Swine, LLC*, 914 N.W.2d 223, 240 (Iowa 2018) (Waterman, J. concurring) ("We need to be cognizant of the right of Iowans to govern themselves through laws passed by their chosen representatives, a right recognized explicitly in article I, section 2 [of the Iowa Constitution]."). The elected branches are accountable to voters.[14] Judges, applying rational basis review to a record made by litigants, should not override legislative policy choices and classifications as irrational.

---

[14]The Iowa legislature is free to ban the use of ATE equipment such as speed cameras or red-light cameras. Most Iowa cities have chosen not to implement ATE ordinances.

## II. The Default Provision of the Ordinance Is Not in Play.

Our court errs by determining that the default provision in the Cedar Rapids ATE ordinance requires reversal of the summary judgment dismissing the plaintiffs' preemption claim. That default issue was never raised in trial court or on appeal, presumably because none of the plaintiffs in this case were defaulted. I doubt the plaintiffs have standing to challenge the default provision, but even assuming they do, the claim was not preserved for appellate review. Neither the trial court nor the court of appeals addressed the default theory, and the City was never given the chance to respond. Our court should not be raising and deciding the issue sua sponte. *Feld v. Borkowski,* 790 N.W.2d 72, 78 (Iowa 2010) ("Our obligation on appeal is to decide the case within the framework of the issues raised by the parties. Consequently, we do no more and no less." (Citation omitted.)); *In re S.P.,* 719 N.W.2d 535, 540 (Iowa 2006) ("[T]he court is prohibited from assuming the role of an advocate."); *Hyler v. Garner,* 548 N.W.2d 864, 876 (Iowa 1996) ("[W]e will not speculate on the arguments [the parties] might have made and then search for legal authority and comb the record for facts to support such arguments."). At a minimum, we should give the parties the opportunity to file supplemental briefing on the default issue. This case was submitted for argument a year ago and resubmitted this August. Our court has had ample time to request supplemental briefing.

Why not wait for another case actually presenting claims by a defaulted party, adversarial briefing, and a trial court ruling to review? Our court, by freelancing without input from the parties, risks unintended consequences and short circuits the adversary system.

The scope of today's gratuitous decision is unclear. Will Iowa cities now be required to go to court to collect fees and penalties routinely paid

on demand or forwarded to collection agencies without a judgment?  Will this be an added burden on the courts and an extra cost to the citizens who now must pay the filing fees for the court action?  I do not know. The City should have been allowed the opportunity to be heard before we decided the issue.

Upon reaching an issue never presented to us, our court comes up with the wrong remedy.  Why invalidate the entire ordinance if only one provision is invalid?  I would apply Iowa's well-settled law to sever and save the rest of the ordinance.  *See* Iowa Code § 4.12 (2018) ("If any provision of an Act or statute or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the Act or statute which can be given effect without the invalid provision or application, and to this end the provisions of the Act or statute are severable."); *Breeden v. Iowa Dep't of Corr.*, 887 N.W.2d 602, 608–09 (Iowa 2016) (reviewing severability doctrine).  Finally, the court fails to explain why these plaintiffs, who were never defaulted, are entitled to reversal of the summary judgment for the City on this ground.

**MANSFIELD, Justice (concurring in part and dissenting in part).**

I generally join the court's opinion except for parts V.A and VI.

In part V.A, I think the court's legal analysis may have merit, but the court is reversing summary judgment on the basis of an argument not advanced on appeal.

I concur as to result only on part VI, except for part VI.H, where I dissent. Because the court is equally divided as to part VI.H, it is my understanding that the district court's ruling here is affirmed by operation of law.

## I. The District Court's Ruling on Preemption Should Be Affirmed.

The district court granted summary judgment to the defendants on the plaintiffs' claim of state law preemption, reasoning,

> The ATE [Automated Traffic Enforcement] ordinance is not preempted because vehicle owners are merely offered an *additional* forum to challenge their ATE citations. Owners may still submit a form specified by the City to have a municipal infraction, as opposed to ATE citation, issued and filed with the court. Accordingly, the ATE ordinance's administrative hearing presents no conflict with the judicial process. For the same reason, the ATE ordinance does not conflict with Iowa Code section 364.22(6) and (4) because, by providing an additional channel to challenge a traffic fine, the ATE ordinance leaves untouched the process of contesting a municipal infraction through a court of law.

(Citations omitted.)

On appeal, the plaintiffs challenge this ruling head-on, arguing that every municipal infraction "must" be heard exclusively in small claims court. Appellants' Br. at 24 ("Using an administrative hearing process before a volunteer citizen with no legal training is not consistent with this language."); *id.* at 25–26 ("The Ordinance permits a type of

administrative hearing that the statute prohibits (by requiring a hearing before a magistrate or district associate judge).").

This argument seems to me plainly wrong. Alternative dispute resolution mechanisms are ubiquitous these days. There is nothing improper when a municipality *supplements* state law by offering another, more efficient way for a vehicle owner to contest a traffic violation.

It is helpful to examine *Rhoden v. City of Davenport,* 757 N.W.2d 239 (Iowa 2008), in some detail. One of the specific preemption issues there was whether Davenport could make civil fines for ATE violations "payable to the City at the City's finance department." *Id.* at 241. Iowa Code sections 364.22(6) and 602.8106 require fines for municipal infractions to be collected by the clerk of court, who then remits ninety percent to the city. *Id.* The plaintiffs argued that Davenport's ordinance was "inconsistent with this requirement." *Id.* We held there was no conflict between the Iowa Code sections and the Davenport ordinance, which "require[d] only that payments for unchallenged violations, which do not involve the court, be payable to the City's finance department." *Id.* We emphasized that section 364.22(6) provides only that "all civil penalties collected *by the court* be payable to the clerk of court and then remitted to the city." *Id.*

Thus, I read *Rhoden* as rejecting the plaintiffs' exclusivity argument. Municipalities can create other mechanisms for processing traffic violations, even when they may deprive the State of Iowa of revenue. Going through the court is not mandatory.

I think the majority makes a plausible showing that any such alternative must ultimately be *backstopped* by a judicial municipal infraction proceeding. That is, unless the vehicle owner has voluntarily opted into an administrative proceeding, the municipality must file a

municipal infraction case before it can collect from a nonpaying, nonresponding vehicle owner. Like the majority, I question whether a city can impose liability on a vehicle owner who does nothing.

However, while this is potentially a good argument, I don't see it anywhere in the plaintiffs' briefing. *See* Appellants' Br. at 23–28; Appellants' Reply Br. at 24–26.[15] Like my colleague Justice Waterman, I would leave its resolution for another day. I would not reverse summary judgment based on an argument not urged on appeal.

Perhaps this argument hasn't been urged on appeal because it doesn't apply to these plaintiffs. As my colleague Justice Waterman points out, none of these plaintiffs has been defaulted. All of them went through the administrative process and have either paid or not paid their fines. They have not alleged that anything happened to them after that.

In addition, even if we reach the majority's theory in this case, there may be defenses. If the owner didn't pay, the owner has suffered no damages. If the owner did pay but committed the ATE violation anyway, how is the owner harmed? The owner paid the same fine he or she would have had to pay anyway. These matters are open for resolution on remand under today's decision.

## II. There Was No Unlawful Delegation.

Turning to my second area of disagreement, I do not believe it amounts to unlawful delegation if a municipality fails to calibrate an outside party's ATE equipment adequately. Lack of calibration may present other issues, but it doesn't amount to unlawful delegation.

In my view, a municipality can use third-party contractors to initially detect traffic violations, so long as a municipal official makes the

_____

[15]I will not quote further from the plaintiffs' briefs, but they are available on the www.iowacourts.gov website.

ultimate call whether to issue a citation or not. *See Hughes v. City of Cedar Rapids*, 840 F.3d 987, 998 (8th Cir. 2016) ("[T]here is no improper delegation (or in statutory terms, conferral) of power upon Gatso."); *Jimenez v. State*, 246 So. 3d 219, 231 (Fla. 2018) (Canady, J., concurring) ("[T]he critical issue is not the details of the relationship between the local government and the vendor. Rather, the dispositive point is that the local government conforms to the requirement that only law enforcement officers and traffic infraction enforcement officers—rather than employees of a vendor—may issue traffic citations.").

A municipality "cannot delegate the right to make decisions it has been empowered to make," but it can "delegate its right to perform certain acts and duties necessary to transact and carry out its powers." *Warren Cty. Bd. of Health v. Warren Cty. Bd. of Supervisors*, 654 N.W.2d 910, 914 (Iowa 2002). Put another way, so long as the municipality makes the final decision, it can outsource "certain acts and duties." *Id.*

*Bunger v. Iowa High School Athletic Association,* 197 N.W.2d 555 (Iowa 1972), illustrates this distinction. There the question was, "Can a school board re-delegate its rule-making power regarding pupils to some other organization?" *Id.* at 559. We said no. *Id.* at 560–63.

This is different. It is undisputed that Cedar Rapids set the criteria for when Gatso should report a violation to it and then reviewed each citation before issuing it. Cedar Rapids did not delegate authority to issue a rule or to bring a civil or criminal charge; rather, the alleged delegation related only to detection of potential violations.

My colleagues cite an unlawful delegation case from the Florida Fourth District Court of Appeal pertaining to ATE enforcement. *See City of Hollywood v. Arem*, 154 So. 3d 359 (Fla. Ct. App. 2014). However, that case is no longer good law. In *Jimenez*, the Florida Supreme Court

specifically disapproved *Arem* while approving other Florida Court of Appeal decisions that ruled otherwise. 246 So. 3d at 231 (majority opinion) ("Accordingly, we answer the rephrased certified question in the affirmative and approve the decision of the Third District in *Jimenez*. We also approve the decision of the Second District in *Trinh* and disapprove the decision of the Fourth District in *Arem* to the extent it is inconsistent with this opinion."). My colleagues discuss *Jimenez* at some length, without ever mentioning that it expressly disapproved *Arem*.[16]

My colleagues confuse an evidentiary issue with an unlawful delegation issue. If Cedar Rapids did not adequately calibrate the ATE equipment, that might be a reason not to allow a reading from that equipment to establish a violation. However, it doesn't present an unlawful delegation problem. Likewise, if the police decide to use an outside DNA testing lab for criminal investigation purposes or a K-9 to detect drugs, that may lead to some evidentiary issues that have to be resolved, but it isn't an improper delegation of governmental power.

I also wonder whether our decision in *City of Des Moines v. Iowa Department of Transportation*, 911 N.W.2d 431 (Iowa 2018), renders the entire calibration issue moot. In that we case, we found the department of transportation lacked the authority to promulgate its regulations regarding municipal ATE systems. *Id.* at 449–50. This would include the regulation requiring municipalities to calibrate ATE systems. Plaintiffs' argument concerning calibration is limited to a single paragraph of its brief and is predicated on the IDOT regulation. *See* Appellants' Br. at 32.

---

[16]My colleagues give more airplay to the intermediate appellate opinion in *Jimenez* (which they label *Jimenez I*) than to the supreme court opinion.

For the foregoing reasons, I concur in part and dissent in part and would affirm the entire summary judgment.

Waterman, J., joins parts I and II of this concurrence in part and dissent in part.

Zager, J., joins part II only of this concurrence in part and dissent in part.